LOLLEY, J.
11 Adrian Cook was convicted by a unanimous 12-person jury for the second degree murder of Derodrick Randle, a violation of La. R.S. 14:30.1. After the trial court denied Cook’s post-verdict motions for acquittal and new trial, he was sentenced to serve the mandatory term of life at hard labor without parole. Cook appealed his sentence and conviction, which we affirm for the following reasons.
Facts
The following evidence was adduced at Cook’s trial. On July 2, 2009, a resident of the Kings Manor Apartments in Shreveport, Louisiana called police and reported hearing gunshots. Shreveport Police Department (“SPD”) Officers Colby Moss and Donald Belanger, Jr., responded to the dispatch. When the officers arrived, the defendant, Adrian Cook, came out of an upstairs apartment shouting “I can’t believe he tried to rob me.” The officers patted down Cook and asked him whether the other individual was still upstairs, to which Cook answered, ‘Yes.”
The officers discovered the bullet-riddled body of Derodrick Randle. The officers saw a stainless-steel Smith & Wesson .38 caliber revolver in one of Randle’s hands. Officer Moss testified that “the butt of the gun was just outside of his index finger or his pointer finger” and that the weapon was resting on the outside of his palm; also, “It did appear as if someone had placed it in his hand.” Officer Moss picked up the weapon, opened the cylinder and ejected five spent cartridge cases from the gun.
The officers entered the apartment and discovered a .40 caliber Glock Model 23 pistol behind a couch. The pistol’s slide was locked open and its ^magazine was empty. After finding no one else in the apartment, the officers returned to the victim. Randle had no pulse, and paramedics were unable to revive him; he died as a result of the gunshot wounds.
Another SPD officer, John Madjerick, arrived at the scene and, at the instruction of the other officers, detained Cook. As Officer Madjerick took the defendant to a patrol car, Cook stated repeatedly, “I’m the victim.” After the officer read Cook his Miranda rights, the defendant made a statement to Off. Madjerick, who testified:
I asked him basically what happened. I asked if he knew the guy that was upstairs that had been shot, he said yes, he’d known him five or six years. He knew his first name was Derodrick but he goes by the street name Can’t Get It Right, I believe is what he said, and they had known each other for some time. He stated that on that date that Dero-drick and another unknown black male came to his apartment and knocked on the door at which time I believe Mr. Cook stated he let them in and then shortly thereafter he said that Dero-drick produced a handgun and he thought was attempting to rob him so at that time he retrieved a handgun and shot Derodrick multiple times in the upper torso.
The officer testified that Cook told him that the victim was armed with the revolver and that he (Cook) was armed with the Glock.
Sergeant David Walls of the SPD conducted the inspection and documentation of the crime scene. He photographed and videotaped the relevant areas in and outside of the apartment, although the victim had already been removed by paramedics before Sgt. Walls arrived. Sergeant Walls also created a diagram of the scene based upon his observations. The only damage inside the apartment caused by bullets was found on the apartment’s front door and to the floor near the entry threshold. Walls *676 said that the damage was “[tjowards the doorway at head level area down to the |3floor and then some impact area straight into the floor at the bottom of the doorway where there were some fragments from a ricochet.” Sergeant Wall identified exhibit photos of this area which showed that most of the 11 spent .40 caliber cartridge cases recovered were on the floor of the hallway entering the apartment, a hallway only slightly wider than the entry door and extending for several feet into the apartment. He also identified five bullet holes in the apartment’s front door that were from about chest height to about knee level, as well as bullet impact damage to the wall outside that door.
Police transported Cook to the police station. Photos of him taken there show a small reddish stain on the front of his shirt but no other evidence of blood or obvious injuries. Once at the police station, SPD Detectives Rod Demery and Robert Gordon interviewed Cook. Detective Demery testified that he and Det. Gordon were assigned to the investigation of the murder. According to Det. Demery, Cook was Mirandized and opted to make a statement, giving the detectives some background about the situation. Cook’s statement taken by Dets. Demery and Gordon was played for the jury. In that statement, Cook told the officers that he had known the victim for years as a friend of a group of people that Cook associated with. The defendant told the officers that the victim came to see him because “I had green [i.e., marijuana] ... I mess with that green. He want to get a little green from me.” Cook also informed the detectives that the victim told him that he wanted to buy either a quarter or a half pound of marijuana, and Cook told the victim to meet him at Cook’s apartment at Kings Manor.
[ 4According to Cook’s statement to the detectives, when the victim arrived by car he was with another man who stayed in the car. Cook told the detectives that the victim then came into the defendant’s apartment:
... and he came in the house and he looked at the stuff. And he like — he was like saying — first, he tried to walk out the door. He grabbed it and tried to walk right out the door — but I was like, hold up, where you going? That’s what made me grab my gun. And so I — I—I grabbed it from him. I was like,' hold up, where you going, man, bring the money. So I put the weed back on the table. So he said he’s gonna go to the car and get it. He went outside. I grabbed my gun, you know what I’m saying, I pulled my gun.... I feel something spooky.... You know what I’m saying, so he come up in the house and — when he go out there, I looked out the window. That’s when I recognized the little dude. He said something to him and then he come back out. He come up the stairs. He come up the stairs. He come in the door. So I go to the door to try to lock the door. And as soon as I come-like my door right here. He come in, he walks around this way. I close it, I try to lock it. I turn around. He’s got the gun. Hey, D Baby, I gotta get you, like that there. I’m like, aw, man, that’s how you gonna do it, like that there? So he walk to the table and grab-tried to grab the green. He grabbed the green and got to walking off like that there. So I went ahead and grabbed him and turned him around cause when I grabbed him, like the gun was right there, facing my little homeboy sitting in my living room. So I twist him and he got to firing off so I’m — I’m [firing] and he let me up and I done hit him in his side a couple of times. And we pushed off and I — and I *677 just kept hitting him. And he fell on the ground so I looked — I tried to open up my door. I see his little partner done shot back down the stairs, you know what I’m saying.
Cook also explained to the officers that one of his friends, a man he identified as “Little Dude,” was present in the apartment during these events. Cook also explained the victim’s position at the time of the shooting:
So he drawed down, so that meant he gotta be back up to the table, to my table and grab [the marijuana] cause I left it on the table. So he grabs it and then he turns back, you know what I’m saying, and tried to walk — tried to walk back out the door | ¿backing up his back. You know what I’m saying, so I knew it was my last chance that he was gonna take it, so I grabbed him, you know what I’m saying. He had the gun. I’m surprised — I mean, Lord, we meeting right now man, that man’s supposed to have shot me in my stomach somewhere .... He squeezed off first. As soon as I grabbed him, like the gun scraped my — you know what I’m talking about, I made sure I had his — had his arm like this here and twist him so he can’t shoot my little homeboy up in the living room. So he start popping.
The detectives knew that no bullet holes had been found in the interior of Cook’s apartment, so they asked him whether both he and the victim were shooting at the door. The defendant replied:
No, matter of fact, how was I shooting? He’s like this here. I turned him around. Yeah, so, yeah, we turned around. I turned him. He pow, pow, pow, and we turned again and I pow, pow, pow, you know what I’m talking about, just kept squeezing. I never got to shoot until I flipped him around by the door, you know what I’m saying.
Forensic pathologist Dr. James Traylor conducted an autopsy of the victim and confirmed that Randle died as a result of a gunshot wound. Dr. Traylor found 12 gunshot wounds on Randle’s body. Seven of the wounds were penetrating (where the bullet enters but does not exit the body), four of the wounds were perforating (where the bullet enters and exits the body) and one wound was a grazing wound. The doctor testified that blood tests showed that the victim had ingested marijuana as much as a day before the killing. Dr. Traylor recovered seven projectiles and one bullet jacket fragment from the victim’s body. Three of the recovered projectiles were of a smaller caliber than the other four. Two of the .38 caliber projectiles were taken from wounds to the victim’s right hip, and one was taken from a penetrating gunshot wound to the victim’s lower chest. In other words, these wounds were inflicted from the victim’s front and right side. The |fiwounds in Randle’s right hip were not close contact wounds because they did not have soot or gunpowder in them.
Three of the .40 caliber projectiles were recovered from penetrating wounds in the victim’s back, buttocks and left arm (the only entrance wounds on the victim’s back), and the other .40 caliber projectile was taken from a penetrating wound to the victim’s upper chest. Thus, the .40 caliber wounds were inflicted from both the front and rear of the victim.
These and other projectiles recovered from the crime scene were submitted to the North Louisiana Crime Lab. Forensic scientist Carla White studied the projectiles and testified at trial. Her analysis revealed that the smaller projectiles recovered from the victim’s body were .38 caliber bullets fired from the revolver that police found in the victim’s hand. The four larger projectiles recovered from the vie- *678 tim’s body were .40 caliber bullets and had characteristics similar to samples fired from the Glock pistol.
Adrian Mayberry also testified at Cook’s trial. He was at Cook’s apartment at the time of the shooting and testified that he had known Cook for over ten years and was his good friend. He said that prior to the shooting, he was watching TV in the apartment when Randle arrived. Mayber-ry explained that he had his back to Cook and Randle while they spoke and did not hear what they were saying before the shooting started. He further explained that once the shooting started, he hit the floor. He “couldn’t tell” if the shots were coming on top of each other.
Cook testified at trial in his own defense. He explained that he had known the victim for several years and was in contact with him on the date |7of the shooting because the victim wanted to buy marijuana. He said that when Randle came in to buy the marijuana, he did not produce any money; instead, he grabbed the marijuana from the dining room table and attempted to leave. When Cook asked where the money was, Randle replied that it was in the car; he left the apartment and went to the car. Cook watched as Randle retrieved an unknown object from the car and then returned to the apartment. Cook said that when Randle reentered the apartment, he had nothing in his hands, so Cook let him in and then turned around to close and lock the door. Cook explained that when he turned around, Randle was pointing a silver-plated gun at him.
Cook testified that Randle got the marijuana and said “I got to get you,” which frightened Cook. Cook said that he was still standing in the narrow hallway that Randle had to traverse to exit the apartment, and that when Randle got close to him, Cook reached for Randle’s gun to try to disarm him. Cook explained that he used both of his hands to grab Randle’s gun hand and that Randle’s gun went off three times that he could recall. Next, Cook said that he was able to push Randle off of him and then was able to retrieve his own pistol from the waistband of his shorts. Cook testified that he then shot at Randle, who fell to the floor in the apartment’s doorway.
On cross-examination, Cook testified that Det. Demery tricked him (Cook) into saying some of the things he said in his statement to the police, including that he “couldn’t let [his] work [i.e., the marijuana] walk out the | sdoor like that” and that something was “spooky” when Randle went back to his car. Cook also said that he acquired the Glock only days before the shooting and had never possessed a gun of his own before. However, Cook admitted that he had previously pled guilty to possessing a stolen firearm, and further admitted that he had been convicted of possession of cocaine. He also admitted that he was engaged in the distribution of drugs at the time of this shooting, but denied that he had the intent to kill or inflict great bodily harm upon Randle.
Cook testified that Randle had control over the revolver the entire time during the struggle and that he (Cook) neither pulled the trigger of that gun nor put the gun in Randle’s hand after the shooting. He admitted that he had moved Randle’s body out of the doorway in order to leave the apartment, give his marijuana to some acquaintances nearby, and have his father (who also lived in the apartment complex) call police. Cook said that the wounds to Randle’s back must have happened because “when you shooting a person not going to stand there and let you shoot them, they going to move and they going to — they going to move around trying to protect or trying to block a bullet or some *679 thing, that had to be how he got hit in the back.”
The jury was unconvinced by Cook’s testimony that he shot Randle in self-defense and did not mean to kill or inflict great bodily harm upon him; as noted, the second degree murder verdict was unanimous and Cook was convicted as charged. Cook was sentenced to the mandatory life term, and he now appeals his conviction and sentence.
1 ¡¡Discussion

Sufficiency of the Evidence

In Cook’s first assignment of error, he argues that the evidence was insufficient to convict him of second degree murder. Specifically, he maintains that the state failed to prove beyond a reasonable doubt that he had the specific intent to kill or commit great bodily harm upon the victim. Further, the defendant argues that the state failed to prove that he did not kill the victim in self-defense.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 448 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.05/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Carter, 42,894 (La.App.2d Cir.01/09/08), 974 So.2d 181, writ denied, 2008-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.02/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La. App.2d Cir.01/14/09), 1 So.3d 833, writ denied, 2009-0310 (La.11/06/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a | , (jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Hill, 42,025 (La.App.2d Cir.05/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La. App.2d Cir.01/14/09), 2 So.3d 582, unit denied, 2009-0372 (La.11/06/09), 21 So.3d 299. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Speed, supra.

Specific Intent to Kill

The offense of second degree murder is defined by La. R.S. 14:30.1, which provides, in part: “A. Second degree murder is the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm.” Only this definition of the crime was read to the jury.
Specific intent is that state of mind that exists when the circumstances indicate the *680 offender actively desired the prescribed criminal consequences Into follow his act or failure to act. La. R.S. 14:10(1); State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. La. R.S. 14:10(1); State v. Draughn, 2005-1825 (La.01/17/07), 950 So.2d 583, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377.
The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Huizar, 414 So.2d 741 (La.1982); State v. Hill, supra. In reviewing the correctness of such a determination, a court should review the evidence in a light most favorable to the prosecution and must determine if the evidence is sufficient to convince a reasonable trier of fact of the guilt of the defendant beyond a reasonable doubt as to every element of the offense. Jackson v. Virginia, supra; State v. Huizar, supra.
It is widely held that the discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person. State v. Seals, 1995-0305 (La.11/25/96), 684 So.2d 368, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Dooley, 38,763 (La.App.2d Cir.09/22/04), 882 So.2d 731, writ denied, 2004-2645 (La.02/18/05), 896 So.2d 30; State v. Brooks, 36,855 (La.App.2d Cir.3/05/03), 839 So.2d 1075, writ denied, 2003-0974 (La.11/07/03), 857 So.2d 517.
 Cook points out that he did not flee from the scene or attempt to avoid apprehension (i.e., he did not have a guilty conscience); thus the | ^evidence was insufficient to prove his intent. In other words, Cook maintains that because he did not flee the scene of the crime, the jury should have accepted that as evidence he lacked the specific intent to kill his victim. It is true that flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience. State v. Durden, 36,842 (La.App.2d Cir.04/09/03), 842 So.2d 1244, writ denied, 2003-1350 (La.11/26/03), 860 So.2d 1131. However, in this case, evidence of the defendant’s specific intent to kill or inflict great bodily harm upon the victim was ample, despite the fact that he did not flee the scene. The victim was shot 12 times — in the front, side and back — and the evidence shows that even more shots were fired during the incident. The jury was well within its discretion to accept this as proof of the defendant’s specific intent and to discount Cook’s denial of his intent. It was also well within the jury’s discretion to assess Cook’s action to remain at the scene of the crime and what bearing that had on his guilt or innocence.

Self-Defense

Cook further argues that the state failed to disprove his assertion that he acted in self-defense when he shot Randle. Typically, in a homicide case self-defense is justification for a killing only if the person committing the homicide reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that deadly force is necessary to save his life. La. R.S. 14:20(A)(1); State v. Dooley, supra; State v. Cotton, 25,940 (La. App.2d Cir.03/30/94), 634 So.2d 937.
113When self-defense is raised as an issue by the defendant, the state has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. State ex rel. D.P.B., 2002-1742 (La.05/20/03), 846 So.2d 753; State v. Garner, 39,731 (La.App. 2d Cir.09/08/05), 913 So.2d 874, writ denied, *681 2005-2567 (La.05/26/06), 930 So.2d 19. When the defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Matthews, 464 So.2d 298 (La.1985).
Louisiana’s statute on justifiable homicide is found at La. R.S. 14:20(A) and provides:
A. A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
(2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.
(3) When committed against a person whom one reasonably believes to be likely to use any unlawful force against a person present in a dwelling or a place of business, or when committed against a person whom one reasonably believes is attempting to use any unlawful force against a person present in a motor vehicle as defined in R.S. 32:1(40), while committing or attempting to commit a burglary or robbery of such dwelling, business, or motor vehicle.
| <4(4)(a) When committed by a person lawfully inside a dwelling, a place of business, or a motor vehicle as defined in R.S. 32:1(40), against a person who is attempting to make an unlawful entry into the dwelling, place of business, or motor vehicle, or who has made an unlawful entry into the dwelling, place of business, or motor vehicle, and the person committing the homicide reasonably believes that the use of deadly force is necessary to prevent the entry or to compel the intruder to leave the premises or motor vehicle.
(b) The provisions of this Paragraph shall not apply when the person committing the homicide is engaged, at the time of the homicide, in the acquisition of, the distribution of, or possession of, with intent to distribute a controlled dangerous substance in violation of the provisions of the Uniform Controlled Dangerous Substances Law.
Thus, the statute provides four alternative scenarios in which a defendant might claim a killing was justifiable homicide.
On appeal, Cook simply argues that the state did not disprove his theory of self-defense, because it had no witness to contradict the defendant’s story. That assertion is meritless; no witness is needed when the physical evidence itself disproves self-defense. Most significantly, Randle suffered gunshot wounds from two different guns, and indeed was shot once in the chest with the gun that the defendant claimed never to have touched during the incident. Even on the cold record, Cook’s account of these events is unbelievable, and the jury was again well within its discretion to reject his self-serving version of the facts.
Although not raised as an assignment of error, we are compelled to note that, without objection, the jury was instructed, in part, that:
[A] homicide is not justified when the person committing the homicide is engaged, at the time of the homicide, in *682 the acquisition of, the distribution of, or possession of, with intent to distribute a controlled dangerous substance in violation of |1fithe provision of the Uniform Controlled Dangerous Substances Law.
Likewise, in its closing argument, the prosecutor argued to the jury that if the jury found that Cook was engaged in the distribution of marijuana at the time of the shooting, the defendant was not entitled to claim self-defense. These assertions are not completely accurate considering the wording of the statute.
As noted, La. R.S. 14:20 provides four distinct instances for which justifiable homicide may be claimed. Pursuant to subsection (A)(1), a homicide is justified when the killer reasonably believes that he is in imminent danger of losing his life and that the killing is necessary to save himself from that danger. This was the basis for Cook’s claim both at trial and on appeal. By contrast, subsection (A)(4)(a) provides justification for a homicide that is committed by someone lawfully inside a home against a person who has made an unlawful entry into the home. Arguably, as some of the evidence reflects, this subsection could have also been the basis for Cook’s claim of self defense-although not specifically advanced by him at trial. Under subsection (A)(4)(a), there is no need for the person using force to believe that he is in danger of losing his life; instead, the person need only reasonably believe that the use of deadly force was necessary to prevent the entry or compel the person to leave. These are two separate pathways leading to a claim of justifiable homicide.
Subsection (A)(4)(b), the “drug sale exception” to self-defense referred to by both the trial court in its jury charge and the prosecution in its | ^closing argument, only applies to subsection (A)(4) and not to the rest of subsection A. Notably, subsection (A)(4)(b) refers to “this Paragraph,” obviously referring to (A)(4). Had the “drug sale exception” been intended as an exception to all four scenarios in which justifiable homicide would be acceptable, the Legislature would have provided the exception as a subparagraph to the entire subsection A. As the wording of the statute indicates, even a drug dealer who commits a homicide can still claim self-defense under La. R.S. 14:20(A)(1) if he believes his life is in danger; he simply is not entitled to “shoot the burglar” to compel him to leave under subsection (A)(4). Thus, despite the trial court’s jury instruction and the prosecution’s closing argument, Cook was not necessarily foreclosed from claiming self-defense, even though he was involved in a drug deal.
The general rule regarding errors in the jury charge is that, unless objected to contemporaneously, an irregularity or error in the charge to the jury may not be asserted on appeal. La. C. Cr. P. art. 841; State v. Belgard, 410 So.2d 720 (La.1982); State v. Robinson, 45,820 (La.App.2d Cir.01/26/11), 57 So.3d 1107, writ denied, 2011-0381 (La.09/16/11), 69 So.3d 1141. Here, notwithstanding the imprecise jury instruction and closing argument, Cook’s trial counsel failed to raise an objection to either; thus Cook failed to preserve the issue for appellate review.[1]
| inCrime Scene Photographs
In his second assignment of error, Cook argues that the trial court erred *683 when it overruled his objections to crime scene photographs. Specifically, he argues that the trial court erred when it allowed the jury to see 16 color photos of the victim’s wounds because the photos were prejudicial to him. We disagree.
Photographs are generally admissible if they illustrate any fact, shed any light upon an issue in the case, or are relevant to describe the person, thing or place depicted. State v. Washington, 30,-866 (La.App.2d Cir.08/19/98), 716 So.2d 936, writ denied, 98-2473 (La.01/08/99), 734 So.2d 1229; State v. Jackson, 30,473 (La.App.2d Cir.05/13/98), 714 So.2d 87, writ denied, 98-1778 (La.11/06/98), 727 So.2d 444. The cumulative nature of photographic evidence does not render it inadmissible if it corroborates the testimony of witnesses on essential matters. State v. Langley, 95-1489 (La.04/14/98), 711 So.2d 651. The admission of photographs is not reversible error unless it is clear that their probative value is substantially outweighed by their prejudicial effect. State v. Washington, supra.
In this case, the photos in question are not gruesome or unduly prejudicial. Although they indeed show the victim’s corpse and the assortment of bullet wounds the victim suffered during the shooting, there is little to no blood, nor are there photos of any dissected tissue. Beyond that, the photos are strongly relevant to show the nature and location of the victim’s wounds, facts critical to the jury’s determination of how the |TSshooting occurred. The photos allowed the pathologist to explain where the victim was shot and which wounds were entrance or exit wounds. In turn, this evidence helped the jury determine the likelihood of whether the wounds caused by shots fired from the revolver were fired by the victim or by Cook (given his version of events). The photos were relevant for purposes far beyond mere proof of which wounds were fatal to the victim. So considering, we conclude that the trial court correctly overruled Cook’s objection to the admission of the photos, and this assignment of error is without merit.

Scope of Redirect Examination of Witness

In his final assignment of error, Cook maintains that the trial court erred when it allowed redirect examination outside the scope and over defense counsel objection. Specifically, Cook objects to the trial court’s choice to allow further questioning of Dr. Traylor at a point where, normally, questioning would have ceased.
During the testimony of Dr. Traylor, examination proceeded normally; he was called as a witness by the prosecutor, and he was cross-examined by defense counsel. On redirect, the prosecutor asked the doctor about the direction of entry of the fatal wounds to the victim. The trial court allowed defense counsel to ask a recross question; specifically, whether the doctor could determine whether any of the victim’s wounds were self-inflicted. The doctor said that he could not tell whether any of the wounds were self-inflicted and said “I can’t totally exclude it.” At that point, the trial court invited the prosecutor to have a re-redirect question, at |19which point defense counsel said “Excuse me, Your Honor, he’s having a re-redirect?” The court responded, “Well, actually, you had reeross which is not allowed by the Code of Evidence and, therefore, since it’s the prosecution’s witness I think it’s only fair that he has one follow-up question.” The defendant did not further object when *684 the prosecutor asked the doctor whether three self-inflicted gunshot wounds would be within a reasonable degree of medical certainty, and the doctor said, “It would be way down on my list; I would not use the phrase reasonable degree of medical certainty.”
On appeal, Cook maintains that the trial court’s choice to allow this “re-redirect” examination was error. The defendant did not object to the trial court’s ruling on his objection, if the comment made by Cook’s trial counsel can even be called an objection. Assuming arguendo that Cook is entitled to raise this as an issue on appeal, in light of La. C. Cr. P. art. 841(A), he has not shown error in the trial court’s handling of the issue. As the trial court pointed out, it allowed the defendant recross examination, and since the issue was one that was relatively new and the witness was the prosecution’s witness, the trial court acted within its discretion to allow further questioning that actually was in the nature of cross-examination. La. C.E. art. 611(D). Any error in the trial court’s handling of this issue was certainly harmless beyond a reasonable doubt, and this assignment of error is without merit.
| 2qConclusion
Considering the foregoing, the conviction and sentence of Adrian Lamar Cook are affirmed.
AFFIRMED.

. Cook may have other avenues to pursue this issue, for instance a claim for ineffective assistance of counsel. However, as a general rule, a claim of ineffective assistance of counsel is more properly raised in an application for post-conviction relief (“PCR”) in the trial court rather than by appeal. This is because PCR creates the opportunity for a full eviden-tiary hearing under La. C. Cr. P. art. 930. State ex rel. Bailey v. City of West Monroe, 418 *683 So.2d 570 (La.1982); State v. Ellis, 42,520 (La.App.2d Cir.09/26/07), 966 So.2d 139, writ denied, 2007-2190 (La.04/04/08), 978 So.2d 325.