WILLIAMS, J.
liA Caddo Parish Grand Jury returned an indictment charging the defendant, De-mond Carey, with second degree murder, in violation of LSA-R.S. 14:30.1. Following a jury trial, he was found guilty of the responsive verdict of manslaughter. He was adjudicated a second-felony habitual offender and sentenced to serve 80 years at hard labor without the benefit of probation or suspension of sentence. For the following reasons, we affirm.
FACTS
On July 19, 2008, at approximately 1:45 p.m., Detective James E. Cromer, Jr., a former member of the Shreveport Police Department Violent Crimes Unit,[1] responded to a call that a man had been shot, possibly deceased, in the Cooper Road area. When the police officers arrived on Nena Street, they discovered the body of a deceased male inside a silver pickup truck parked on the side of the street. Detective Cromer testified that numerous bullet holes had been fired into the vehicle and the driver’s side window; the victim was behind the steering wheel, slightly leaned to the right, with his head tilted down. There was a gun on the floorboard next to the victim’s feet and blood splatter throughout the vehicle.
A short while into the investigation police officers learned that there was another crime scene — the Quick Pack convenience store on David Raines Road in Shreveport. When officers arrived at the Quick Pack location, they discovered a hole in the window of the convenience store and bullets lying on a newspaper stand. Detective Cromer, along with another detective, were able to identify and interview several witnesses: Haston | ¡.Smith, Roy Riley and two teenaged girls.
The investigation revealed that a group of people were sitting around drinking alcohol, playing dominoes and dice under a tree in an empty lot next to the Quick Pack. The group included Demond Carey (the defendant), Demarcus Jones and Lon-zell Armstrong (the victim). An argument ensued; the defendant, the victim and Jones left and later returned with guns. When the victim returned, he began to walk toward the tree next to the store. However, a witness, Haston Smith, convinced the victim to return to his truck and leave. The victim returned to his truck and started the engine. However, before he could drive away, Jones fired multiple gunshots at the victim’s truck from the driver’s side. Simultaneously, the defendant, Demond Carey, fired multiple gunshots into the back passenger side of the victim’s truck. After the shooting ceased, the victim drove away and was found dead in his truck on Nena Street, approximately two blocks from the scene.
Through the investigation and information obtained from a confidential informant, Detective Cromer was able to identify two suspects: Demarcus Jones (a.k.a. “Papa”) and Demond Carey (a.k.a. “Money”). Several days after the shooting, Jones was arrested at a hotel on Monk- *225 house Drive in Shreveport. Several months later, the defendant was taken into custody in Georgia, with the assistance of United States Marshals.
On October 16, 2008, the defendant was charged by bill of indictment with second degree murder.[2] On October 8, 2010, the state filed a motion to ^invoke firearm sentencing provisions. The jury trial began on October 25, 2011.
Sergeant Tommy Rachal, of the Shreveport Police Department, assisted in the investigation of this matter.[3] Sgt. Rachal testified that he processed the crime scene on Nena Street, as well as the crime scene surrounding the convenience store. The state presented into evidence the diagrams Sgt. Rachal made of both crime scenes. The state also introduced into evidence photographs taken of the crime scenes which depicted the following: the Quick Pack and the parking lot; two bullets that hit a Marlboro sign inside the Quick Pack; the victim’s truck on Nena Street; bullet holes along the passenger side of the victim’s truck; the front of the victim’s truck; bullet holes in the driver’s side of the victim’s truck; a bullet hole in the driver’s seat headrest; a .22 caliber revolver that was located on the floorboard underneath the victim’s feet; and the victim seated in the truck.
Sgt. Rachal testified that the bullets in the driver’s side of the victim’s truck were consistent with medium to large caliber bullets. Based on trajectory dowel rod tests conducted by Sgt. Rachal, he concluded that the shots on the driver’s side came from the left side of the vehicle and the two |4shots on the passenger side came from the rear of the vehicle. He stated that if the damage was inflicted simultaneously, it could not have been inflicted by only one person.
Based upon Sgt. Rachal’s testimony, the state also introduced into evidence several spent .40 caliber cartridge casings that were found in the front area of the parking lot of the Quick Pack. Sgt. Rachal testified that there were also spent casing by the roadway sidewalk, thus the gunshots came from the roadway toward the store. The state then introduced into evidence the .22 long rifle revolver that Sgt. Rachal recovered from the front floorboard of the victim’s truck; it had four spent casings and two cartridges. However, Sgt. Rachal testified that there was no physical evidence to indicate that the victim’s .22 caliber gun was fired at either crime scene. Based on his examination of the crime scene and the physical evidence, Sgt. Ra-chal concluded that two moderate to large caliber weapons were fired at the victim’s truck, and both weapons were aimed toward the occupant compartment of the truck.
On cross-examination, Sgt. Rachal testified that the legal limit for blood alcohol content in Louisiana is .08. He also stated that the bullets which landed in the passenger side window of the victim’s truck were fired from the driver’s side of the vehicle.
*226 Chasity Johnson also testified during the trial.[4] Johnson testified that on the day of the shooting, she was outside on the porch at her grandmother’s house with her sister, Darika Kirkendoll. She stated that she | sheard men arguing about a dice game in the field next door to the house; she did not know any of the men. Johnson also testified that she saw a big, tall, “dark-skinned” man walk across her grandmother’s front yard, then come back, “fumbling with something” in his pants. This man and another “light-skinned” man walked to the Quick Pack and began shooting at a dark gray truck. She stated that she never saw the man inside the truck with a gun. Johnson testified that both men were shooting at the same time, but she did not know which man fired the first shot. She stated that one of the shooters was on the driver’s side and the other was on the passenger side. Johnson also stated that she did not hear anyone arguing immediately before the shooting. She stated that the man in the truck drove away when the shooting ended.
On cross-examination, Johnson testified that after she heard the argument about the dice game, she did not notice anyone leave in a vehicle. She also stated that she regularly goes to her grandmother’s house, and she had previously seen people sitting under the tree playing dice and drinking. However, she had never heard any of the men making threats.
Darika Kirkendoll also testified.[5] Kirk-endoll testified that, on the day of the shooting, she and Johnson were in the yard at her grandmother’s house. She stated that she saw a group of older men playing dice in the field next door; she did not know any of the men. Kirkendoll also testified that she saw the men leave the scene and then come back. She stated that a dark-skinned, heavyset man walked across her grandmother’s yard and she IfiSaw him place a gun in the back of his pants. About 10 to 15 minutes later, an older model truck pulled into the Quick Pack parking lot, and then she heard gunshots. Kirkendoll testified that she did not hear anyone arguing prior to hearing the gunshots. She stated that she did not see the man in the truck get out of the truck and she never saw him with a gun. She also testified that two men were shooting at the truck: the “heavyset” man was shooting into the passenger side, and the “tall, bald-headed, bright-skinned” man was shooting into the driver’s side. Kirk-endoll testified that her grandmother made her and her sister go into the house during the gunshots; she did not see the truck leave.
On cross-examination, Kirkendoll testified that she recognized Omar Taylor, the defendant’s nephew, “from seeing him around”; however she did not know his name. She stated that Taylor was there when the shooting occurred, but she did not see him shooting a gun. Kirkendoll also stated that after the “heavyset” man walked across her grandmother’s yard, he went back under the tree. She stated that the gray truck was approximately 15-20 feet away from her grandmother’s porch.
Roy Riley testified that he knew the defendant, the victim and Jones.[6] He stated that on the day of the shooting, he and *227 Haston Smith went to the Quick Pack. When they arrived, he did not know what was going on, but a lot of people were standing around, as usual. Riley stated that Jones asked him for a cigarette, then he heard someone say, “There he is.” Riley denied |7knowing who the person was talking about. He stated that he saw the victim walking toward them with a gun, but Smith said, “I got this” and ran over to talk to the victim. Riley stated that while Smith went to talk to the victim, he talked to Jones, who also had a gun. He stated that he told Jones not to go “over there” but Jones kept walking. Riley stated that Jones walked down the sidewalk, toward Smith and the victim; Jones had his gun under his arm. Riley testified that at that point, he heard gunshots. He also testified that prior to hearing the gunshots, he did not hear Jones say anything or shoot or point his gun. Further, Riley stated that the victim got into his truck approximately 30 seconds before the shooting started. According to Riley, Jones was shooting at the driver’s side of the truck and the defendant was shooting at the back of the truck from his location “in the field.” Riley stated that when the shooting ceased, the victim drove away. Riley identified the defendant in open court.
On cross-examination, Riley testified that he knew Omar Taylor and remembered seeing him after the shooting. Riley admitted that he had been drinking alcohol before he arrived at the Quick Pack and that he told a police officer who interviewed him that he was drunk. Riley stated that when he was talking to Jones, they were approximately 40-50 feet away from the victim. He also stated that Jones started shooting first and that he fired most of the shots.
On redirect, Riley described Jones as “kind of heavyset.” He also testified that Jones was the first shooter and the defendant was the second shooter.
IsHaston Smith also testified at the trial.[7] He stated that he knew the defendant, the victim and Jones, and he identified the defendant in open court. Smith stated that on the day of the incident, he and Riley arrived at the Quick Pack, where a group of men usually “hung out” under a tree to drink and gamble. He stated that he saw the victim drive up and he heard somebody say, “There he is.” Smith testified that he asked if the victim had “got[ten] into it” with anyone, and someone replied, “Yes.” Smith responded that he could “stop it” and walked over to the victim. Smith stated that he and the victim were approximately 25 feet from the group of people who were under the tree. He also stated that the victim told him that he was tired of “them” thinking he was a bitch. Smith testified that he told the victim to return to his truck because “he was not going to win this one.” He stated that the victim got into his truck and started the engine. Smith testified that the victim did not say anything to anyone after he got back into his truck. He stated that the victim had a gun in his belt, but he never saw him pull it out or wave it. Smith testified that Jones walked up the sidewalk and asked Smith if he was all right; Smith responded, ‘Tes.” Smith stated that he told Jones to go back to the tree. However, Jones approached the truck and began shooting; Smith stated that he “got out of the way.” Smith also testified that he saw the defendant walk from the tree to the back of the victim’s *228 truck and begin shooting at the truck. According to Smith, when the shooting ended, the victim drove away.
|9On cross-examination, Smith testified that he had not been drinking alcohol before going to the Quick Pack. He stated that he was at the store approximately 4-5 minutes before the shooting started. Smith also admitted that he did not tell the investigating police officers that he had witnessed the shooting. Smith testified that he did not know who the victim was angry with because no one mentioned the victim’s name. Smith further testified that when he told the victim that he was “outgunned,” he did not know who had a gun; however, he knew that the people under the tree were known to carry guns. Smith stated that he did not have time to ask the victim what was going on; he was just trying to put a stop to the situation. He testified that after the victim got in the truck and started it, he just sat there as if he was “out of it.” Smith stated that when Jones walked up to the truck, there was no communication between Jones and the victim. Smith testified that he did not know what happened to the victim’s gun. On redirect, Smith testified that prior to the shooting, the victim did not “go after” anyone, did not make threats to anyone, and did not point a gun at anyone.
Dr. James Traylor, a forensic pathologist at LSU Health Sciences Center in Shreveport, also testified for the state. He was qualified by the court as an expert in forensic pathology. Dr. Traylor testified that he performed the autopsy on the victim, and the cause of the victim’s death was multiple gunshot wounds resulting in asphyxia and hemorrhage.
Dr. Traylor testified that the victim’s toxicology report showed he had a blood alcohol level of .09. He also stated that he completed a GSR gunshot residue test on the victim. During the course of his testimony, the 110state presented into evidence the autopsy and toxicology report, a diagram of the gunshot wounds on the victim’s body, photographs of the victim’s gunshot wounds, and the three bullets recovered from the victim’s body.
Dr. Traylor testified that the victim had six gunshot wounds: three penetrating (Wounds A, B and C) and three perforating (Wounds D, E and F). With regard to the victim’s gunshot wounds, Dr. Traylor testified as follows:
Wound A — the bullet went in and came out of the top of the victim’s left shoulder, re-entered at his left jaw, and ended up in his right clavicle. This indicates that the victim’s head must have been in a flexed position, with his chin toward the chest;
Wound B — the bullet entered the victim’s upper left back and proceeded into his upper left lung;
Wound C — the bullet entered the side wall of the victim’s left abdomen and ended up in his right lower back;
Wound D — the bullet entered the victim’s right elbow and exited on the back upper portion of his right arm;
Wound E — the bullet entered the back of the victim’s left upper arm and exited his chest; and
Wound F — the bullet entered the victim’s left forearm and exited where his wrist and hand met. This wound also had tattooing, or intermediate range of fire, meaning that the gun was fired from within a few inches of the skin’s surface, leaving gun powder deposits.
Dr. Traylor testified that there was no evidence of the order in which the gunshot wounds occurred; however, most of the wounds, with the exception of Wound F, were irregular entry wounds because the bullets had passed through another object. He stated that this would be consistent *229 with someone being shot while seated in a vehicle.
InOn cross-examination, Dr. Traylor testified that if the victim was sitting in the driver’s seat of a vehicle, the shooter would have to have been to his left side. He stated that all of the victim’s wounds occurred from the driver’s side of the vehicle and that the main track of all of the wounds was from left to right.
The state also called Richard Beighley, a criminalist and the firearms section supervisor at the North Louisiana Crime Lab, to testify. Beighley, who was qualified by the court as an expert in firearms identification and analysis, evaluated the evidence in this case for firearms identification, and he prepared a certified crime lab report, which was admitted into evidence. Beigh-ley testified that there were two types of gun rifling in this case: conventional and polygonal, which is unique to Glocks. He concluded that four of the six .40 caliber cartridge casings, which were found in the Quick Pack parking lot, were fired out of the same Glock firearm. He stated that the other two casings had similar characteristics; however, he could not conclude that they came from the same gun. Beighley testified that the bullets which were recovered from the victim’s body were .40 caliber bullets that were fired from a polygonal rifled weapon, consistent with a Glock. He also determined that one of the bullet jackets was missing the core, had conventional rifling, and was consistent with a .38/.357 caliber bullet. According to Beighley, that rifling is typically fired from a revolver. Therefore, Beighley concluded that there was at least one Glock handgun fired and one revolver fired at the scene of the shooting.
The state also called Darnell Armstrong, the victim’s older brother, to |12testify.[8] Armstrong testified that on July 19, 2008, he arrived at the scene and identified the victim and his truck for the detectives.
The defendant did not testify. The defense called Jones, the co-perpetrator, as its only witness. Jones admitted that he knew the defendant but refused to answer any further questions.
Following closing arguments, the jury found the defendant guilty of the responsive verdict of manslaughter. The jurors were polled, revealing that the verdict was rendered by a vote of 10-2.
Subsequently, on November 10, 2011, the state filed a Second-Felony Habitual Offender Bill of Information, and a habitual offender hearing was conducted on December 12, 2011. During the hearing, Lieutenant Owen McDonnell was qualified as an expert in latent fingerprint analysis and identification. Lt. McDonnell testified that he had examined the defendant’s fingerprints, and he identified the defendant as the same person who pled guilty to manslaughter and three counts of attempted first degree murder on March 1, 1995.[9] The trial court adjudicated the defendant a second-felony habitual offender.
The court denied the defendant’s motions for a new trial and post-verdict judgment of acquittal. In another motion, styled “Defendant’s Statement on Sentene- *230 ing and Motion for Downward Departure Under \nDorthey, ” the defendant argued that the court should consider the actions of the victim, the minor role that the defendant played in the homicide and the sentence that the actual killer, Jones, would receive (17 years) pursuant to a plea bargain.[10] The defendant also argued that he defended himself against an “angry and intoxicated” victim, who wanted to kill the defendant for no justifiable reason. Additionally, the defendant argued that Jones fired the fatal shots, while he (the defendant) was not trying to harm the victim because the shots that he fired only struck the passenger side of the victim’s truck.
At the hearing on the defendant’s motion, the defendant argued that the shooting was merely a circumstance of being in the wrong place at the wrong time with the wrong person. The defendant also argued that he was not the person who fired the fatal shot in his prior manslaughter conviction either. Additionally, the defendant maintained that he was defending himself in his previous convictions for attempted first degree murder. According to the defendant, the three victims were trying to harm him as a result of the first manslaughter conviction. The trial court denied the motion and sentenced the defendant to serve 80 years at hard labor without the benefit of probation or suspension of sentence. The defendant’s motion to reconsider sentence was denied.
The defendant appeals his conviction and sentence.
| DISCUSSION
The defendant contends the evidence was insufficient to prove that he was guilty of manslaughter beyond a reasonable doubt. He argues that the state failed to present sufficient evidence to negate his contention that he acted in self-defense. According to the defendant, he fired his weapon only after the victim drove his truck back to the Quick Pack, exited his truck with a loaded gun, and walked toward the tree until he was convinced to get back in his truck. The defendant also claims that the victim made threats and had been drinking before the shooting. The defendant asserts that despite the urgent nature of the situation, the victim entered his truck, but remained at the scene approximately 30-40 seconds. During this time, Jones began firing shots into the driver’s side of his truck, and the defendant walked toward the truck, but remained about 25-40 feet away from it. The defendant argues that he fired shots only after Jones and/or the victim fired shots, and all of his shots were fired into the passenger side of the victim’s truck.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Carter, 42,894 (La.App.2d Cir.1/9/08), 974 So.2d 181, writ denied, 2008-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in LSA-C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), *231 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence, and inferred from the circumstances established by that evidence, must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582, unit denied, 2009-0372 (La.11/6/09), 21 So.3d 299.
Where there is conflicting testimony concerning factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622, writs denied, 2002-2595 (La.3/28/03), 840 So.2d 566, 2002-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004). In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if hfibelieved by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gullette, 43,032 (La.App.2d Cir.2/13/08), 975 So.2d 753; State v. Burd, 40,480 (La.App.2d Cir.1/27/06), 921 So.2d 219, unit denied, 2006-1083 (La.11/9/06), 941 So.2d 35. The trier of fact is charged to make a credibility evaluation and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Sosa, 2005-0213 (La.1/19/06), 921 So.2d 94.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a trier of fact’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685.
As stated above, the defendant was convicted of the offense of manslaughter. Manslaughter is a homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. LSA-R.S. 14:31. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed. Id.
“Sudden passion” and “heat of blood” are not elements of the offense 117of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them. State v. Lombard, 486 So.2d 106 (La.1986). The defendant is required to prove by a preponderance of the evidence that he acted in “sudden passion” or “heat of blood” for a verdict of manslaughter to be appropriate. State v. Robinson, 32,794 (La.App.2d Cir.3/1/00), 754 So.2d 311, unit denied, 2000-0989 (La.3/23/01), 787 So.2d 1008.
LSA-R.S. 14:20 provides, in pertinent part:
*232 A. A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
(2) When committed for the purpose of preventing a violent or forcible felony involving, danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.
[[Image here]]
Self-defense is justification for a killing only if the person committing the homicide reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that deadly force is necessary to save his life. LSA-R.S. 14:20(A)(1); State v. Dooley, 38,763 (La.App.2d Cir.9/22/04), 882 So.2d 731, writ denied, 2004-2645 (La.2/18/05), 896 So.2d 30.
118When self-defense is raised as an issue by the defendant, the state has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. State v. Cook, 46,843 (La.App.2d Cir.1/25/12), 86 So.3d 672, writ denied, 2012-0640 (La.6/22/12), 91 So.3d 969; State v. Garner, 39,731 (La.App.2d Cir.9/8/05), 913 So.2d 874, writ denied, 2005-2567 (La.5/26/06), 930 So.2d 19. When the defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Cook, supra; State v. Matthews, 464 So.2d 298 (La.1985).
In the instant case, the state presented the testimony of several eyewitnesses to the shooting and to the events leading up to the shooting. Additionally, the state presented the testimony of Dr. Traylor, Detective Cromer, Sgt. Rachal and Richard Beighley, who all corroborated the basic sequence of events that occurred on the day of the shooting.
All of the testimony established that the defendant and Jones both fired shots at the victim’s truck. Johnson and Kirken-doll testified that they saw one of the men shooting into the driver’s side of the truck and the other man shooting into the passenger side of the truck. Both Riley and Smith provided unrefuted testimony that Jones fired multiple gunshots into the driver’s side of the truck and that the defendant fired shots from the back of the truck. Detective Cromer testified that a total of 17 shots were fired. Sgt. Rachal investigated the crime scenes and explained that the bullet holes on | t9the victim’s truck could not have been caused by only one shooter if the weapons were fired simultaneously. He testified that the shots on the driver’s side came from the left side of the truck and the shots on the passenger side came from the rear. Beighley testified that there were two different types of weapons fired: a .40 caliber Glock handgun and a .38/.357 revolver. Dr. Traylor testified that Armstrong died of six gunshot wounds, and all of the gunshot wounds occurred from his left side, or the driver’s side of the vehicle.
There was no evidence presented at trial to support the defendant’s contention that he acted in self-defense. The evidence indicates that there was an argument earlier that day between the men under the *233 tree at the Quick Pack and that at least three of the men (the defendant, the victim and Jones) left, only to return with guns. When the victim returned, he began walking toward the group of men under the tree with his gun. However, Smith convinced him to get back in his truck. It is undisputed that the victim had returned to his truck and had started the engine when the defendant and Jones started shooting. No words were exchanged between the victim and anyone at the scene after the victim entered his truck, and the victim never waved or pointed his gun at anyone.
Dr. Traylor testified that the victim’s gunshot wounds were irregular, which would be consistent with someone being shot while seated in a vehicle. In addition, according to the testimony of Smith and Riley, the group of people under the tree, where the defendant was located, were approximately 25-40 feet from the victim’s truck.
|2nIt is undisputed that the victim had a gun in his possession. Riley and Smith both testified that they saw the victim with a gun prior to the shooting; Sgt. Rachal testified that a .22 revolver was found on the floorboard of the victim’s truck and that it had four spent casings and two cartridges. However, the evidence is clear that the victim did not shoot or point his gun at anyone. Smith testified that the victim’s gun was in his belt, but he never pulled it out or waved it. Riley testified that the victim never shot or pointed his gun at anybody. Johnson and Kirkendoll testified that they never saw the victim with a gun. Additionally, Sgt. Rachal testified that there was no physical evidence that the victim’s gun was fired during this incident.
Additionally, although the victim had a blood alcohol level of .09 at the time of his death, there was no evidence presented that the victim threatened the defendant or anyone else. Riley testified that he did not hear the victim say anything in the moments leading up to the shooting. Likewise, Smith, who was standing close to the victim, testified unequivocally that the victim never threatened anyone. In fact, Smith stated that the victim did not say anything to anyone after he got back into his truck. According to Smith, neither Jones nor the victim said anything to each other before Jones and the defendant started shooting. None of the witnesses testified that the victim threatened the defendant in any way on the day of the shooting.
Furthermore, the evidence showed that both the defendant and Jones left the scene after the shooting. Detective Cromer testified that throughout 121his investigation, there was no evidence to indicate that either the defendant or Jones had been threatened by the victim that day and were acting in self-defense.
After a thorough review of the entire record, we find that there is no evidence in the record to support the defendant’s contention on appeal that he reasonably believed that he was in imminent danger of losing his life or receiving great bodily harm, such that deadly force was necessary to save his life. As stated above, the evidence was uncontroverted that the victim was in his truck. He was not making any threats or pointing his gun at anyone. The evidence showed that the victim had entered his truck, started the engine and was likely about to drive away from the Quick Pack store when the defendant and Jones began shooting. The defendant walked toward the victim’s truck and started shooting into the vehicle from a distance of approximately 25-40 feet. Thus, we find that a reasonable trier of fact could have concluded that the defendant did not shoot at the victim in self-defense. Accordingly, after considering the evidence *234 in the light most favorable to the prosecution, we find that any rational trier of fact could have concluded, beyond a reasonable doubt, that the defendant is guilty of the offense of manslaughter and that he was not acting in self-defense. This assignment of error lacks merit.
The defendant also contends the trial court imposed a harsh and constitutionally excessive sentence. He argues that his sentence, 80 years at hard labor, without the benefit of probation or suspension of sentence, is excessive and serves no purpose other than the needless infliction of pain l^and suffering. The defendant maintains that the jury convicted him of manslaughter, thereby rejecting the state’s claim that he was guilty of second degree murder, which carries a mandatory life sentence. Therefore, according to the defendant, the trial court, by imposing an 80-year sentence, effectively imposed the life sentence that the jury’s verdict precluded.
In reviewing a sentence for ex-cessiveness, an appellate court utilizes a two-pronged test. First, the record must show that the trial court took cognizance of the criteria set forth in LSA-C.Cr.P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Lathan, 41,-855 (La.App.2d Cir.2/28/07), 953 So.2d 890, writ denied, 2007-0805 (La.3/28/08), 978 So.2d 297. The articulation of the factual basis for a sentence is the goal of LSA-C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with LSA-C.Cr.P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982); State v. Swayzer, 43,350 (La. App.2d Cir.8/13/08), 989 So.2d 267. The important elements which should be considered are the defendant’s personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense, and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Ates, 43,327 (La.App.2d Cir.8/13/08), 989 So.2d 259, unit denied, 2008-2341 (La.5/15/09), 8 So.3d 581. There is no requirement | ^that specific matters be given any particular weight at sentencing. State v. Shumaker, 41,547 (La.App.2d Cir.12/13/06), 945 So.2d 277, unit denied, 2007-0144 (La.9/28/07), 964 So.2d 351.
Second, the court must determine whether the sentence is constitutionally excessive. A sentence violates La. Const. Art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, 2001-0467 (La.1/15/02), 805 So.2d 166; State v. Robinson, 40,983 (La.App.2d Cir.1/24/07), 948 So.2d 379.
Manslaughter is punishable by imprisonment at hard labor for not more than 40 years. LSA-R.S. 14:31. However, LSA-R.S. 15:529.1 provides, in pertinent part:
A. Any person who, after having been convicted within this state of a felony, or who, after having been convicted under the laws of any other state or of the United States, or any foreign government of a crime which, if committed in this state would be a felony, thereafter commits any subsequent felony within this state, upon conviction of said felony, shall be punished as follows:
*235 (1) If the second felony is such that upon a first conviction the offender would be punishable by imprisonment for any term less than his natural life, then the sentence to imprisonment shall be for a determinate term not less than one-half the longest term and not more than twice the longest term prescribed for a first conviction.
[[Image here]]
| i>4The defendant herein was adjudicated a second-felony habitual offender, having prior convictions for manslaughter and three counts of attempted first degree murder. Therefore, the trial court imposed a sentence of 80 years at hard labor without benefit of probation or suspension of sentence.
A trial court has broad discretion to sentence within the statutory limits. State v. Dunn, 30,767 (La.App.2d Cir.6/24/98), 715 So.2d 641; State v. Guzman, 99-1528, 99-1753 (La.5/16/00), 769 So.2d 1158. Absent a showing of manifest abuse of that discretion, the appellate court may not set aside a sentence as excessive. State v. Guzman, supra.
In the instant case, the trial court considered the guidelines set forth in LSA-C.Cr.P. art. 894.1. The court also noted that the defendant is a second-felony offender, who previously pled guilty to manslaughter in addition to three counts of attempted first degree murder. The court also noted that if the defendant would not have pled guilty to his previous convictions on the same day, he would have been adjudicated a third-felony offender. Additionally, the court noted that the current shooting took place at a convenience store with a number of people standing around, including the two teenaged girls who testified, and two bullets went through the window of the store. Thus, other persons could have been injured during the commission of this crime. Furthermore, the court stated that the defendant discharged a firearm during the commission of this offense, as confirmed by a number of witnesses who testified that he was one of the men shooting at the victim.
| asThe court also addressed the defendant’s argument that none of the bullets fired from his weapon injured the victim by stating that it did not believe that “because someone’s a good shot versus a crappy shot that the person that’s the bad shot should be rewarded as compared to the person that was the good shot.” The court expressed its belief that the evidence was sufficient to support a conviction for second degree murder, rather than manslaughter; had the defendant been convicted as charged, he would be facing a mandatory life sentence. The court concluded that a lesser sentence would deprecate the seriousness of this crime and the defendant’s past behavior. Considering the above, the court sentenced the defendant to serve 80 years at hard labor without the benefit of probation or suspension of sentence.
Maximum sentences are generally reserved for the worst offenses and offenders. State v. Taylor, 41,898 (La.App.2d Cir.4/4/07), 954 So.2d 804. Courts have upheld the maximum sentence of 80 years for second-felony offenders convicted of manslaughter. See, State v. Glaub, 2010-761 (La.App. 5th Cir.5/24/11), 66 So.3d 1170;[11] State v. Hyman, 10-335 (La.App.5th Cir.2/15/11), 62 So.3d 146, writ denied, 2011-0558 (La.9/30/11), 71 So.3d *236 282; State v. Johnson, 2009-0706 (La.App.4th Cir.5/26/10), 41 So.3d 1188.
After reviewing the record in its entirety, we find that the trial court | gndid not abuse its discretion in sentencing the defendant to serve 80 years in prison without benefit of probation or suspension of sentence.[12] The sentencing range for the defendant, a second-felony offender convicted of manslaughter, was not less than 20 years and not more than 80 years at hard labor. The defendant, acting in concert with another person, fired multiple gunshots at the victim’s vehicle, with full knowledge that the victim was inside the truck. This brazen act was committed in broad-daylight and in full view of numerous eyewitnesses. The defendant showed no regard for the safety of other innocent bystanders, including two teenaged girls who were in the yard of the house next door, or for anyone who may have been working or shopping inside of the store. Considering the defendant’s actions and criminal history, particularly his propensity to commit crimes similar to the instant offense, the trial court’s imposition of the maximum sentence allowed by law is neither grossly disproportionate to the severity of the offense, nor is it a purposeless and needless infliction of pain and suffering. This assignment lacks merit.
^CONCLUSION
For the reasons set forth herein, we affirm the defendant’s conviction and sentence.
CONYICTION AFFIRMED; SENTENCE AFFIRMED.

. At the time of the trial, Detective Cromer had retired from the Shreveport Police Department.

. Jones was also arrested and charged with second degree murder. He initially pled guilty to manslaughter; however, he later withdrew his plea and was tried and convicted of second degree murder. During the defendant’s trial, Jones was called to testify as a witness for the state. Jones was present with counsel, who objected to the state's questioning. Jones then asserted his rights against self-incrimination and refused to testify in this case.

. At the time of the shooting, Sgt. Rachal was assigned to the Crime Scene Identification Division. However, at the time of trial, he was the Supervisor of the Traffic Bureau for the Shreveport Police Department.

. Johnson was 13 years old at the time of the incident and 16 years old at the time of the trial.

. Kirkendoll was 15 years old at the time of the incident and 18 years old at the time of the trial.

.Riley admitted to having a criminal history which included convictions for: possession of marijuana (1983), resisting arrest (1995), gambling in public (1995) and possession of Schedule I CDS (2001).

. Smith admitted to a criminal history which included convictions for: attempted theft (1973), simple escape (1977), attempted manslaughter (1983), possession of Schedule II CDS with intent to distribute (1989), entering and remaining after being forbidden to do so (1998), DWI (1998), careless operation (1998) and simple battery (1998).

. Darnell Armstrong admitted that his criminal history included a conviction for possession of marijuana with intent to distribute (1984).

. In the prior case, the defendant was convicted of second-degree murder after he shot and killed Johnny Lee Atkins. This Court set aside his conviction and remanded the matter for new trial. See, State v. Carey, 628 So.2d 27 (La.App. 2d Cir. 1993), writ denied, 635 So.2d 236 (La.1994). On remand, the defendant pled guilty to manslaughter. On that same day, the defendant also pled guilty to three counts of attempted first degree murder for a separate, unrelated, incident.

. As stated above, Jones withdrew his guilty plea to manslaughter and was later convicted of second-degree murder, which requires the imposition of a mandatory sentence of life in prison without benefit of probation, parole or suspension of sentence.

. In State v. Glaub, supra, during an argument with the victim, the defendant went inside the house and retrieved a gun; the victim began walking away, and the defendant came out of the house and started shooting. The defendant, who was charged with second degree murder, was found guilty of manslaughter and sentenced, as a second-offender, to 80 years’ imprisonment. The defendant claimed that he killed the victim in *236 self-defense. The court rejected his argument and affirmed his conviction and sentence.

. The court minutes and both parties, in their briefs, indicate that the sentence was imposed without the benefit of probation, parole, or suspension of sentence. However, the transcript from the sentencing hearing reveals that the trial court only imposed the sentence without the benefit of probation or suspension of sentence. When there is a discrepancy between the minutes and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732 (La.1983). Therefore, the trial court imposed the sentence in accordance with La. R.S. 15:529.1(G), which provides that a sentence imposed under the habitual offender statute is to be served without the benefit of probation or suspension of sentence. That statute does not require that the sentence be served without the benefit of parole.