30 A.3d 955

**Antajuan Lawntee WILSON**

v.

**STATE of Maryland.**

**No. 136, Sept. Term, 2010.**

Court of Appeals of Maryland.

Oct. 25, 2011.

Sherrie B. Glasser, Asst. Public Defender (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for petitioner.

Jeremy M. McCoy, Asst. Atty. Gen. (Douglas G. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, *MURPHY, ADKINS and BARBERA, JJ.

Opinion by MURPHY, J.

In the Circuit Court for Howard County, a jury convicted Antajuan Lawntee Wilson, Petitioner, of first degree murder and related offenses, including use of a handgun in the commission of a crime of violence. Petitioner concedes that the State's evidence was sufficient to establish that he committed those offenses on April 9, 2008, but argues that he is entitled to a new trial on the ground that the Circuit Court erroneously refused to instruct the jury on the (partial) defenses of "imperfect self defense" and the "rule of provocation." In *Wilson v. State of Maryland,* 195 Md.App. 647, 7 A.3d 197 (2010), the Court of Special Appeals rejected those arguments and affirmed the judgments of conviction. Petitioner then filed a petition for writ of certiorari, in which he presented this Court with two questions:

1. Did the lower courts err in modifying and/or rejecting the "some evidence" standard established by this Court in *Dykes* [*v. State,* 319 Md. 206, 571 A.2d 1251 (1990)], by holding that the "some evidence" requirement is not satisfied by evidence which the lower courts deem unworthy of belief?

2. Did the trial court err by refusing to instruct the jury on the mitigation defenses of hot blooded response to adequate provocation and imperfect self defense?

For the reasons that follow, we answer "no" to Petitioner's second question, but "yes" to Petitioner's first question. We shall therefore reverse the judgment of the Court of Special Appeals.

---

* Murphy, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

## Background

As the Court of Special Appeals stated:

At approximately 11:00 A.M. on the morning of April 9, 2008, in an area known as Bryant Woods in Columbia, the appellant shot Brian Adams four times. Adams died of "multiple gunshot wounds." The appellant was indisputably the homicidal agent. The only issue before us is whether the evidence generated at least the reasonable possibility that the appellant, because of extenuating circumstances, may have been guilty only of manslaughter rather than of murder.

195 Md.App. at 656, 7 A.3d at 202.

The confrontation that ended with the fatal shooting occurred a short time after Petitioner had initially encountered the victim and two of the victim's friends at a gas station, where one of the victim's friends said to Petitioner, "We'll fuck you up," and, "Fuck, we could beat you up right now." As to what occurred thereafter, the State's brief "accepts" the following statements in Petitioner's brief:

Mr. Wilson returned to his grandmother's home located several minutes away. He promptly tried to reach his cousin, "Chris," by phone, because he had been "kind of intimidate[d]" by the encounter at the Crown Station. When there was no answer, Petitioner decided to walk to Chris's home "on the other side in Oakland Mills." Concerned that he might run into the trio, he changed his clothes so that he would not be recognized and took a steak knife from the kitchen "for backup." Mr. Wilson expressly stated that he had not gone out for the purpose of finding the trio, but recognized that an encounter was possible.

He left his house and started walking towards his cousin's home. On his way, he saw the three youths. He stated that when they noticed him "they threw their hands up," which Petitioner interpreted as meaning that they "wanna fight." In discussing his intent as he approached the group, he testified as follows:

Q. Was it your intention to start something?

A. Not really. Really it was my intention to squash it.

Q. What does that mean?

A. Squash it means, like, come to an agreement.

Q. Okay. And did you have a thought about how you were [sic] come the [sic] that kind of agreement?

A. Talk to him, you know what I mean, tell him that I'm not from around here, you know what I'm saying, I just moved out here, you know what I'm saying, I'm not too familiar with the area.

Q. Okay, Well, why did you bring a knife? A. Because in case they got aggressive.

As Mr. Wilson walked toward the youths, Adams stepped toward Wilson with his hand in his pocket. Adams' "homeboys" remained about two feet behind him. Mr. Wilson acknowledged being "nervous" and kept his hand on the knife in his pocket. Adams asked what he had in his pocket. Mr. Wilson asked the same. Mr. Wilson stated that they went "back and forth," until Adams pulled out a gun, looked at Petitioner and "smiled." Asserting that he was "scared," Mr. Wilson "grabbed" for Adams' weapon and was able *to* pull it away from him. In approximately fifteen seconds, Mr. Wilson fired four shots at Adams and then fled, dropping the gun as he ran.

The police subsequently created a "person wanted" flier and began a canvass of the area. Three days later, on the morning of April 12th, Detective Clay Davis and Detective Vickie Shaffer knocked at the door of the residence at 10848 Green Mountain Circle. Mr. Wilson answered the door. They handed him the flier and told him that they were investigating a homicide. Mr. Wilson's hands were noted to shake as he took the flier. He denied any knowledge of the incident.

After the officers left, Mr. Wilson called his mother in Georgia and told her that he had "got into it with some dudes." She advised him to contact the police. He did so, and Detectives Davis and Shaffer subsequently returned to Wilson's residence at approximately 11:30–11:45 a.m. In a

recorded interview, Mr. Wilson acknowledged having been at the Crown station to purchase cigarettes, and stated that he later heard shots fired, but denied any knowledge of the shooting.

At 3:30 p.m. that same afternoon, a team of officers returned to Mr. Wilson's home and placed him under arrest. He was transported to the Northern District Station.

Petitioner again met with Detective Davis and Detective Shaffer at approximately 8:00 p.m. After waiving his Miranda rights, he provided a second statement which was similar in content to the first.

At 9:00 p.m. Mr. Wilson was transported by Sergeant Justin Baker to Central Booking. While awaiting processing, Petitioner made several inquires to Baker, including whether he had to admit committing the act in order to claim self-defense. The sergeant responded, "not necessarily ... that is why it is called a defense." Mr. Wilson requested another meeting with Detectives Davis and Shaffer. He stated that he had come to recognize the severity of the situation and decided that it was necessary that the detectives hear his side of the story. Mr. Wilson was transported back to Northern District where he met with the two detectives at 11:09 p.m.

In this third interview, Mr. Wilson stated that he had changed his clothes before leaving the house, "cause I figured they was gonna look for somebody in my, you what I'm saying, that had my clothes on." He further told the police that when he saw the three youths, they "flagged [him] down." He admitted that he shot Adams, but repeatedly asserted that he was "shook" when Adams pulled out the gun and that he "froze" when Adams aimed it at him and smiled. Petitioner asserted, "I ain't never been that scared in my life." He continued[,]

> I was shook. Like I said, when he pulled his out, I was shook. Honest. Turned like this, smiled. And I ain't his bitch ass. I mean, shit, *Kill or be killed. You know what I'm saying?* What you gonna do if somebody pulled a gun on you? Man.

Mr. Wilson was adamant that he had no intention to kill anyone, adding,

> I'm not no killer ... I'm not no murderer ... Really, I ain't even want to fight ... and I'm saying it all happened so fast, man.

During the interview, the nineteen year old attempted to respond to the numerous scenarios proposed by the police. He acquiesced in their assertion that he had been upset because he had been disrespected, but denied the allegation that "[Adams] punked you and you got mad; and you shot him." Mr. Wilson rejoined, "That ain't how it went down ..." At one point, Detective Shaffer asserted: "[I]t almost seems as though you came in here to set us up for self defense. And maybe, maybe you were defending yourself ..."

(Emphasis supplied.)

Petitioner's trial counsel requested that the Circuit Court instruct the jury on the partial defenses of imperfect self defense and hot blooded response to lawfully adequate provocation. The Circuit Court's denial of those requests was accompanied by the following on-the-record analysis:

> Mr. Wilson's response to that [first confrontation] was to go home and at that moment he was very deliberative, **he thought through what he intended to do. First he called for his cousin for backup, which suggests to me that Mr. Wilson was looking to take care of business immediately,** because you can't walk around with your cousin for the rest of your life. And that's true because Mr. Wilson said he's not the kind to run, he's gonna take care of it. He put on—he changed his clothes, **he changed his clothes for, quite frankly, competing reasons, one was to, maybe, not be identified by the three boys, but the other was not to be identified by other persons, should he be involved in an altercation.** So, again, he was thinking beyond personal safety, he was thinking at that point [of] lack of detection. And he armed himself with a knife as backup, since he couldn't find his cousin and then, according to his testimony,

he proceeded to want to walk towards Oakland Mills. And he left, clearly, very shortly—left his home, clearly, very shortly after he arrived. **He certainly didn't wait to give the three a chance to vacate the area.** So he was certainly, aware of the probability or possibility at least, that he would see these boys again, which is why he armed himself. When he saw the boys there was, according to the testimony, a gesturing by Bryan Adams, a raising of the hands in the air.

. . . **[I]t was his view that the raising of the hands was an invitation to fight and he crossed a road to go towards Mr. Adams.**

\*    \*    \*

And according to his testimony he put his hand in his pocket where the knife was. And Mr. Adams, according to him, had his hands in his pockets, so they both were looking at each other with their hands in their pockets. **And there's a lot of thinking going on here, a lot of decision making going on here, none of which smacks nor is there any evidence that there's fear of death or imminent bodily harm coming, so that's [him] protecting himself.** In fact, he's going towards the source of the fear of death and imminent bodily harm, if that's what was present at this point. . . . [W]hen Mr. Adams is looking at one of his friends the Defendant disarms him and he holds the gun for upwards of—for a period of whatever, but 15 seconds is the number that was testified to, before firing the shots four times. During that time period, when asked about his state of mind, and that's the operable time period, really, for this, when asked about his state of mind, he expressed that he was caught up in the moment. There's no specific articulation of fear of death or serious imminent bodily harm, there's no specific articulation of observations that prompted his fear, at that moment. He has the upper hand, he has control of the situation, he's, by all accounts, at that moment in time, not confronted by a weapon. **There's no articulation of any behavior by Brian Adams, during that moment in time, that would—that could be pointed to as a**

source that would cause fear of imminent death or of death or serious bodily harm.

(Emphasis supplied).

As stated above, the jury convicted Petitioner of first degree murder.

## Discussion

### I.

In *State v. Faulkner*, 301 Md. 482, 483 A.2d 759 (1984), while affirming *Faulkner v. State*, 54 Md.App. 113, 458 A.2d 81 (1983), this Court held that "the honest but unreasonable belief standard of imperfect self defense," although not a complete defense, "mitigates murder to voluntary manslaughter." *Id.* at 486–500, 483 A.2d at 761–68. In *Dykes v. State*, 319 Md. 206, 571 A.2d 1251 (1990), this Court stated:

It is clear from our *Faulkner* that "when evidence is presented showing the defendant's subjective belief that the use of force was necessary to prevent imminent death or serious bodily harm, the defendant is entitled to a proper instruction on imperfect self-defense." 301 Md. at 500, 483 A.2d 759 (footnote omitted), quoted in *Simmons v. State*, 313 Md. 33, 39, 542 A.2d 1258 (1988). For entitlement to the instruction with respect to both perfect self-defense and imperfect self-defense,

the defendant has the "burden of initially producing 'some evidence' on the issue of mitigation or self-defense . . . sufficient to give rise to a jury issue. . . . Once the issue has been generated by the evidence, however, the State must carry the ultimate burden of persuasion beyond a reasonable doubt on that issue."

*Simmons*, 313 Md. at 39–40, 542 A.2d 1258, quoting *State v. Evans*, 278 Md. at 207–208 [362 A.2d 629]. *See Cunningham v. State*, 58 Md.App. 249, 257, 473 A.2d 40, cert. denied, 300 Md. 316, 477 A.2d 1195 (1984).

\*　　\*　　\*

It is only when "some evidence" has been adduced which is looked to by the defendant on the issue of self-defense or

other mitigation, that the State "must carry the ultimate burden of persuasion beyond a reasonable doubt on that issue." *Id.*

\* \* \*

*Some evidence* is not strictured by the test of a specific standard. It calls for no more than what it says—"some," as that word is understood in common, everyday usage. It need not rise to the level of "beyond reasonable doubt" or "clear and convincing" or "preponderance." **The source of the evidence is immaterial; it may emanate solely from the defendant. It is of no matter that the self-defense claim is overwhelmed by evidence to the contrary. If there is any evidence relied on by the defendant which, if believed, would support his claim that he acted in self-defense, the defendant has met his burden. Then the baton is passed to the State. It must shoulder the burden of proving beyond a reasonable doubt to the satisfaction of the jury that the defendant did not kill in self-defense.**

*Id.* at 215–17, 571 A.2d at 1256–57. (Emphasis supplied).

■ Applying the "some evidence" test to what Petitioner told the investigating officers as well as to Petitioner's trial testimony, we are persuaded that Petitioner was entitled to a proper instruction on imperfect self defense. The Circuit Court's conclusion to the contrary was based upon inferences that—although entirely consistent with the evidence that "overwhelmed" Petitioner's claim that he acted in self-defense—invaded the province of the jury. While affirming the judgment of the Circuit Court, the Court of Special Appeals stated:

With absolutely everything the appellant said and did pointing indisputably in one windward direction, he cannot now claim the protection of the lee shore by claiming that his initiation of the renewed encounter was not with the intention "to start something" but was only with the counter "intention to squash it." It may take only slight evidence to generate a jury issue, but slight evidence must still be

somewhat more than preposterous.... [E]very inane statement does not ipso facto satisfy the burden of production. 195 Md.App. at 668, 7 A.3d at 209. In the case at bar, however, the jury received evidence that, when asked by the detectives what he thought when he saw the victim's handgun, Petitioner responded:

> I was shook. Like I said, when he pulled his out, I was shook. Honest. Turned like this, smiled. And I ain't his bitch ass. I mean, shit, *Kill or be killed. You know what I'm saying?* What you gonna do if somebody pulled a gun on you? Man.

As Petitioner had elected to be tried by a jury, it was not for the court to determine whether that response was preposterous and/or inane. It was the jury's duty to determine the reasons why Petitioner (1) changed his clothes, (2) armed himself with the knife, (3) left the safety of his grandmother's house, (4) decided to approach the victim and the victim's friends,[1] and (5) after gaining control of the victim's gun, fired the shots that caused the victim's death.

Although Petitioner's "Kill or be killed" claim was (in the words of the *Dykes* Court) "overwhelmed by evidence to the contrary," it was legally sufficient to require a jury determination of whether the State's evidence proved beyond a reasonable doubt that—at the moment when he shot the victim— Petitioner did not have a subjective belief that he was in immediate danger of death or serious bodily harm. Under these circumstances, because the Circuit Court erroneously declined to deliver a proper instruction on "imperfect self defense," Petitioner is entitled to a new trial.

---

1. Both the Circuit Court and the Court of Special Appeals concluded that, because Petitioner approached the victim and the victim's friends, Petitioner was the "initial aggressor" and was for that reason not entitled to the jury instruction at issue. From our review of the record, however, we disagree with those conclusions. Moreover, the defendant who was the first combatant to employ non-deadly force *is* entitled to assert the defense of (perfect or imperfect) self-defense against a combatant who has responded by employing deadly force. *See* Charles E. Moylan, Jr., *Criminal Homicide Law* § 10.4 at 197 (MICPEL 2002).

**544**

## II.

From our review of Petitioner's statement and testimony, we agree with the Court of Special Appeals that the evidence was insufficient to generate the issue of whether, at the moment he shot the victim, Petitioner "was acting in hot-blooded rage brought on by the act of [the victim] in pulling a gun from his pocket and smiling." 195 Md.App. at 682, 7 A.3d at 217. As noted in Petitioner's brief, he expressly denied the suggestion of the investigating officers that he had fired the shots because he "got mad." We therefore hold that the Circuit Court correctly rejected the request for a "hot-blooded response . . ." instruction.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH DIRECTION TO REMAND THE CASE TO THE CIRCUIT COURT FOR HOWARD COUNTY FOR A NEW TRIAL; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY HOWARD COUNTY.**