*Carlos Nicholson v. State of Maryland,* No. 862, Sept. Term 2017. Opinion filed on November 5, 2018, by Berger, J.

CRIMINAL LAW - FELONY MURDER - SELF DEFENSE - HARMLESS ERROR

A criminal defendant produced "some evidence" sufficient to generate a self-defense jury instruction when he claimed to be afraid for his life when he killed an alleged assailant after being robbed at gunpoint, even when the claim of self-defense is contradicted by other evidence. A defendant who has generated "some evidence" of self-defense is entitled to have the jury instructed on self-defense even when inconsistent theories of the defense are presented.

When a jury returns a not guilty verdict as to first-degree and second-degree murder, but a defendant is convicted of second-degree felony murder, any error with respect to a self-defense instruction is harmless beyond a reasonable doubt because self-defense is not applicable to felony murder under Maryland law.

CRIMINAL LAW - SUFFICIENCY OF THE EVIDENCE - CONFESSION

A conviction cannot rest on an uncorroborated confession alone. A conviction of possession of marijuana with intent to distribute was sufficiently corroborated by text messages and eyewitness testimony as well as evidence of the circumstances of the shooting that occurred during a drug deal gone awry.

CRIMINAL LAW - SUFFICIENCY OF INDICTMENT

A statutory short-form indictment is sufficient to charge a defendant with second-degree felony murder.

Circuit Court for Baltimore County
Case No. 03-K-16-0541

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 862

September Term, 2017

_____

CARLOS NICHOLSON

v.

STATE OF MARYLAND
_____

Berger,
Nazarian,
Arthur,

JJ.
_____

Opinion by Berger, J.
_____

Filed: November 5, 2018

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document " authentic.



Suzanne C. Johnson, Acting Clerk

This appeal arises from a criminal proceeding before the Circuit Court for Baltimore County. Carlos Nicholson ("Nicholson"), appellant, was convicted of possession of marijuana with intent to distribute, conspiracy to distribute marijuana, and second-degree felony murder. On appeal, Nicholson presents three questions for our review, which we have rephrased as follows:

1. Whether the circuit court erred in refusing to instruct the jury on self-defense.

2. Whether the evidence was sufficient to sustain a conviction for possession of marijuana with intent to distribute.

3. Whether the indictment against Nicholson supported a charge of second-degree felony murder.

For the reasons explained herein, we shall affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS

### I.     Shooting and Arrest

On January 7, 2016, at 10:45 p.m., Baltimore County Police received reports that shots had been fired on Lower Gate Court in Owings Mills. Upon arriving, police found Treshawn Johnson ("Johnson") lying unresponsive on the ground in front of 27 Lower Gate Court clenching a loaded .357-caliber revolver. Johnson had been shot in the chest and leg, and he died at the scene. Police discovered Mancino Carpentieri ("Carpentieri") limping nearby with gunshot wounds on his back and thigh. On the ground near Carpentieri was a loaded semiautomatic .380-caliber pistol.

Nicholson was arrested on January 10, 2016. Police searched Nicholson's home and recovered a bag containing .42 grams of marijuana, a bag containing 28.29 grams of

marijuana, and two scales with marijuana residue on them. A box of sandwich bags was seized from the top of the dresser in the master bedroom. Nicholson's vehicle was seized the same day.

## II. Nicholson's Statement

While in custody, Nicholson waived his *Miranda* rights. Nicholson was interviewed by Detective Carroll Bollinger and Detective Klimko. Nicholson told the detectives that "[t]hose two people . . . they not victims. They came there to rob me. You can see in my phone that they, I sell weed." Nicholson continued, "They robbed me. They robbed me. They . . . took my weed, they took everything from me."

Nicholson told the police that he had received a text message from someone named "Man" who "wanted to buy a pound" of marijuana. Nicholson did not have that amount of marijuana, so he contacted Fallon Stewart ("Stewart"), who agreed to provide the product and give Nicholson "a cut." On the night in question, Nicholson met Stewart in a parking lot on Lower Gate Court. Stewart entered the rear passenger side of Nicholson's vehicle. Later, Johnson and Carpentieri arrived. Nicholson told the police that he had never dealt with the men before. Johnson and Carpentieri entered Nicholson's vehicle. Nicholson described the events that followed:

> [W]hen they got in the truck, they cocked a gun and put it straight in my head. One in the front, one in the back of me. The one in the backseat got out of the car and pulled me to the ground. And that was it. And he, he fired one shot at me and I, I thought I was hit to be honest. I rolled under the car and I just, just laid there like until it was done. I heard a bunch of shots, once the shots stopped I jumped in the truck and I pulled out.

2

Nicholson said that in the struggle with his assailant he "grabbed" the assailant's gun. When the detective asked if Nicholson had "turn[ed] the gun on his assailant, Nicholson said, "Maybe I did. Maybe that's when the shot went off. To be honest with you like it's, it's blurry. It's . . . I was scared as shit." When one of the detectives told Nicholson that the man who died had two bullets from his own gun "in him," Nicholson said,

> [M]aybe I did turn the gun on him while we was tussling. I, I couldn't, I couldn't tell you, I just remember the shots going off and I, I remember thinking I was hit. . . . I remember going down to the ground. And I remember when I went down to the ground I remember hearing a bunch of shots.

Nicholson added that "once the shots stopped . . . I jumped up and I looked and Fallon was like 'where's my friend?'" Nicholson drove out of the parking lot behind Stewart, who was in a Kia Sportage.

When the detectives pressed Nicholson on his story, Nicholson insisted:

> [W]hat I do remember is just being in the car, the boy putting the gun on, putting it to my head telling me to kick everything out. And the dude from the backseat with the revolver, I remember him pushing her out of the car. Or I don't know if she put, like you know push him out. I don't know what happened. I just know he opened my door and tried to pull me out and when he was pulling me out I just felt like he was gonna shoot me. So we, we were tussling. And that's when the shots went off. And I fell down to the ground. And that was it.

> After that, when I fell to the ground, I hear the shots, a lot of shots. Like a lot of shots. I don't know how many shots. Maybe like 17 or something. 18 or maybe, maybe a lot. I don't know, but I heard shots. A whole bunch of shots.

> That's all I really remember. I came up after, after the shots were stopped.

3

Nicholson insisted that neither he nor Stewart brought a gun to the rendezvous. At the conclusion of the interview, a technician photographed a "small mark" on Nicholson's back that Nicholson said was caused by the bullet that grazed him.

### III.    The Trial

Nicholson was charged with first-degree murder, attempted first-degree murder, use of a firearm in the commission of a crime of violence, possession of a firearm with a nexus to a drug trafficking crime, possession of marijuana with intent to distribute, and conspiracy to distribute marijuana. The State used the statutory short-form indictment of Maryland Code (2002, 2012 Repl. Vol., 2016 Supp.), § 2-208 of the Criminal Law Article ("Crim. Law") to charge Nicholson with first-degree murder.

#### A.    *Eyewitness Testimony*

Lewis Vega ("Vega") testified that he was at his home on Lower Gate Court with his mother and his friend, Anthony Piechowski ("Piechowski"), on the night in question. Vega testified that he heard gunshots at around 10:30 p.m. When Vega looked out the window, he saw a woman standing by the passenger side of a car and a man approaching the passenger side of a vehicle parked across the street. Seconds later, Vega heard shots coming from inside the vehicle and saw someone run away. Vega testified that he "saw muzzle flashes from inside the car." Vega's mother pulled him and Piechowski away from the window. Vega returned to the window six seconds later and saw two vehicles leaving the parking lot. Piechowski testified that "we just saw people running out in the parking lot and what looked like flashes." Piechowski photographed the license plate of one of the vehicles. Police later used the photograph to determine that the Kia Sportage was being

4

leased to Danika Floyd, who told the police that Shawn Reeves ("Reeves"), the father of her children, had been driving the vehicle.

Sylvester Wambui ("Wambui"), who lives at 4345 Lower Gate Court, testified that he was smoking a cigarette outside his home at around 10:30 p.m. on the night in question when he noticed two men standing near the parking lot. Shortly thereafter, Wambui saw two cars ("V1" and "V2") enter the parking lot. Wambui saw someone exit V2 and enter V1. Wambui heard gunshots and saw someone exit the driver's side door of V1. Wambui heard two or three more gunshots and saw a dark shadow standing outside the driver's door, which was open, shooting down. The shadowy figure returned to V1, and both vehicles drove away.

### B. *Additional Evidence*

The State's tool mark examiner testified that both of the guns recovered at the scene had been fired, but that neither gun had fired the bullets that shot Carpentieri and Johnson. He also testified that the bullets removed from Carpentieri and Johnson were fired from the same firearm.

The medical examiner, Dr. James Locke ("Dr. Locke"), testified that Treshawn Johnson had been shot in the chest, just below the nipple line and near the midline of the chest. The bullet entered the chest and struck the right lung and the right flank area. Dr. Locke testified that there was evidence of soot and stippling around the gunshot wound in Johnson's chest. Dr. Locke concluded that Johnson's chest wound was consistent with a gunshot at close range. Dr. Locke testified that when the end of a gun barrel is placed up against the body, the bullet exiting the firearm will cause the release of a tremendous

5

amount of energy and produce a blowout of the area. Dr. Locke testified that this was probably what caused the large hole in Johnson's shirt. Johnson had also been shot in the left leg.

Sgt. Thomas Stetson ("Sgt. Stetson") testified that he had previously worked undercover in narcotics. Sgt. Stetson testified that he was nearly robbed on one occasion when he was engaged in an undercover purchase of marijuana. Sgt. Stetson testified that the distribution of marijuana is dangerous.

The State also introduced text messages between Stewart and Reeves. In one message, Stewart wrote, "This off like 5G." Reeves responded, "I don't know how it's off. It was 225, that's a G," and then added, "I did it myself. I still have the other half." The parties stipulated that "448 grams equals one pound of marijuana."

## IV. Motion for Judgment of Acquittal

At the close of evidence, Nicholson filed a motion for judgment of acquittal. Nicholson argued that "the only evidence is that it was self-defense," leading to the following exchange with the trial judge:

> THE COURT: Well Mr. Carpentieri was shot in the back.
>
> [DEFENSE COUNSEL]: I understand. I understand.
>
> THE COURT: All right. Well, so self-defense is harder to see when someone's shot in the back.
> [DEFENSE COUNSEL]: Well one time is in the thigh and very conceive --
>
> THE COURT: Two times in the back.
>
> [DEFENSE COUNSEL]: Yes, I understand. And, but as he's running away after putting a gun to the head of my client

6

> according to the statement in the, my client gives which is the only evidence we have, he put a gun to his head. I do not --
>
> THE COURT: As long as he's running away and you shoot him that's, starts to sound more like murder.

Nicholson also argued that selling marijuana is not an inherently dangerous felony that would support a second-degree felony murder charge.

The trial judge denied Nicholson's motion and proceeded to instruct the jury. When Nicholson requested an instruction on self-defense, the trial judge responded, "I don't think that self-defense was generated in this case."

## V.     Conviction and Sentencing

The jury found Nicholson guilty of possession of marijuana with intent to distribute, conspiracy to distribute marijuana, and second-degree felony murder. The circuit court sentenced Nicholson to twenty-five years in prison, five years suspended, for second-degree felony murder, and to a concurrent sentence of five years for conspiracy. The court also placed Nicholson on five years of supervised probation. Nicholson timely appealed.

## DISCUSSION

## I.     The Circuit Court's Refusal to Instruct the Jury on Self-Defense Was Harmless Error.

### A.     *The Circuit Court Erred In Refusing to Instruct the Jury on Self-Defense.*

Nicholson argues that he "clearly met his burden to produce at least 'some evidence' . . . which would permit a jury to find that he acted in perfect self-defense." The State contends that Nicholson's claim of self-defense was inconsistent with both the forensic evidence and Nicholson's own statement to the police. We hold that Nicholson

7

presented sufficient evidence to generate the issue of self-defense, and that the circuit court erred in refusing to propound the requested instruction.

We review a trial court's decision to give or refuse a jury instruction under the abuse of discretion standard. *Stabb v. State*, 423 Md. 454, 465 (2011) (quoting *Gunning v. State*, 347 Md. 332, 351 (1997)). Upon the request of any party, a trial court is required to "instruct the jury as to the applicable law and extent to which the instructions are binding." Md. Rule 4-325(c). "[I]n evaluating the propriety of a trial court's refusal to give a requested instruction, we must determine whether the requested instruction was a correct statement of the law; whether it was applicable under the facts of the case; and whether it was fairly covered in the instructions actually given." *Gunning v. State*, 347 Md. 332, 348 (1997). In the present case, the only dispute between the parties is whether an instruction on self-defense was applicable under the facts of the case.

"For an instruction to be factually generated, the defendant must produce 'some evidence' sufficient to raise the jury issue." *Arthur v. State*, 420 Md. 512, 525 (2011). In Maryland, the defendant has the "burden of initially producing 'some evidence' on the issue of mitigation or self-defense." *Porter v. State*, 455 Md. 220, 240 (2017) (quoting *Wilson v. State*, 422 Md. 533, 541 (2011)). This standard is "a fairly low hurdle for a defendant," which the Court of Appeals has articulated as follows:

> Some evidence is not strictured by the test of a specific standard. It calls for no more than what it says -- "some," as that word is understood in common, everyday usage. It need not rise to the level of "beyond reasonable doubt" or "clear and convincing" or preponderance. The source of the evidence is immaterial; it may emanate solely from the defendant. It is of no matter that the self-defense claim is overwhelmed by

8

evidence to the contrary. If there is any evidence relied on by the defendant which, if believed, would support [defense], the defendant has met his burden.

*Arthur*, *supra*, 420 Md. at 526 (quoting *State v. Martin*, 329 Md. 351, 359 (1993)). "Whether the evidence is sufficient to generate the requested instruction in the first instance is a question of law for the judge." *Gen. v. State*, 367 Md. 475, 487 (2002). "In evaluating whether competent evidence exists to generate the requested instruction, we view the evidence in the light most favorable to the accused." *Id.*

Turning to the present case, the State argues that an instruction on self-defense was not generated by the evidence. We disagree. The record shows that Nicholson presented "some evidence" to support each element of perfect self-defense. The elements of perfect self-defense in Maryland are well established:

> (1) The accused must have had reasonable grounds to believe himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant;
>
> (2) The accused must have in fact believed himself in this danger;
>
> (3) The accused claiming the right of self-defense must not have been the aggressor or provoked the conflict; and
>
> (4) The force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.

*Holt v. State*, 236 Md. App. 604, 622 (2018) (quoting *State v. Faulkner*, 301 Md. 482, 485-86 (1984)). Imperfect self-defense, on the other hand, "requires no more than a subjective honest belief on the part of the killer that his actions were necessary for his safety, even

9

though, on an objective appraisal by a reasonable man, they would not be found to be so." *Id.* (quoting *Faulkner v. State*, 54 Md. App. 113, 115 (1983)).

The jury was presented with evidence that Nicholson was reasonably afraid for his life when he killed Johnson. Nicholson told the police that two men attempted to rob him at gunpoint, and that one of the men threw him to the ground and shot at him. Nicholson stated that he struggled with the assailant and grabbed his gun. Nicholson admitted that he may have "turn[ed] the gun" on his assailant during the struggle, but he said that his memory was "blurry" because he "was scared as shit." Nicholson's assertion that he was robbed at gunpoint and shot at is consistent with what police found at the crime scene, namely, a loaded firearm in Johnson's hand and a loaded firearm found near the wounded Carpentieri. The State's tool mark examiner later testified that both of these weapons had been fired. Nicholson's assertion that he may have shot one of his assailants during a physical struggle was consistent with the medical examiner's testimony that Johnson had been shot in the chest at very close range.

Nicholson also presented evidence that Johnson and Carpentieri were the aggressors and that Nicholson used reasonable force to defend himself against violent assailants with loaded firearms. According to Nicholson's statement, he was simply trying to conduct a drug sale when Johnson and Carpentieri drew their weapons on him unprovoked and attempted to rob him. Nicholson maintained that neither he nor Stewart were armed. Nicholson told the police that he may have shot one of the men during a struggle, at which point Nicholson rolled under a vehicle and waited for the shooting to stop. Although these claims are supported by no evidence beyond Nicholson's own statement to the police,

10

"[t]he source of the evidence is immaterial; it may emanate solely from the defendant." *Arthur*, *supra*, 420 Md. at 526. Accordingly, we conclude that Nicholson presented "some evidence" to support all four elements of his self-defense claim

To be sure, Nicholson's statement is contradicted on many points by other evidence in the record. The State's tool mark examiner testified that Johnson and Carpentieri were shot by a third firearm that was never found, suggesting that Nicholson was, in fact, carrying his own gun and used it to kill Johnson. The State's forensic expert also testified that Johnson and Carpentieri were shot by the same gun, suggesting that Nicholson was also responsible for shooting Carpentieri. This testimony was especially damaging to Nicholson's self-defense claim because Carpentieri had gunshot wounds on his back and thigh, suggesting that Nicholson fired multiple times on Carpentieri while Carpentieri was fleeing. Nevertheless, "what evidence to believe, what weight to be given it, and what facts flow from that evidence are for the jury, not the judge, to determine." *Dykes*, *supra*, 319 Md. at 224. Viewing the evidence in the light most favorable to the accused, we conclude that Nicholson presented sufficient evidence to generate the issue of self-defense.

The State argues that Nicholson's statement cannot generate the issue of self-defense because Nicholson never admitted to shooting anyone. To be sure, Nicholson's remarks on this question were equivocal. At one point in his statement, Nicholson flatly denied shooting Johnson while admitting, in the same breath, that it was possible:

> But I wasn't the shooter. I didn't shoot him. I didn't shoot not one person and if I did shoot the dead guy it was during the tussle and it was with his gun.

11

Nevertheless, Nicholson admitted to being at the scene of the shooting, to "tussling" with one of the victims, and to grabbing the victim's gun. Nicholson admitted that he may have shot one of the men. Furthermore, the State introduced other evidence at trial supporting a finding that Nicholson was the shooter, including Wambui's testimony about the shadowy figure shooting down from the driver's side of V1. This evidence, combined with the evidence that Nicholson was a victim of armed robbery, was sufficient to generate the issue of self-defense.

The State contends that "in order for the jury to believe that Nicholson acted in self-defense and shot Johnson and Carpentieri, the jury would have had to reject either the forensic evidence or Nicholson's claim that he did not have a gun." In essence, the State argues that Nicholson may not rely on a combination of contradictory evidentiary sources to generate a factual issue for a jury instruction. We disagree. "In its assessment of the credibility of witnesses, [a fact-finder is] entitled to accept -- or reject -- *all, part, or none* of the testimony of any witness, whether that testimony was or was not contradicted or corroborated by any other evidence." *Omayaka v. Omayaka*, 417 Md. 643, 659 (2011) (emphasis in original). Consequently, the jury in the present case could have believed that Nicholson was the victim of an unprovoked attack by two armed men while doubting Nicholson's claim that he was unarmed and did not shoot anyone.

The State argues that a jury instruction on self-defense would have been inconsistent with Nicholson's attempt to prove at trial that he was not the shooter. The Court of Appeals has made it clear, however, that "a defendant is entitled to have the jury instructed on any theory of defense that is fairly supported by the evidence, even if several theories offered

12

are inconsistent." *Sims v. State*, 319 Md. 540, 550 (1990); *see also McKay v. State*, 90 Md. App. 204, 219 (1992) (holding that even though the defendant testified "that he acted out of fear when inflicting the injury on his accuser, the presiding judge must, when requested, give an instruction on heat of passion where other evidence supports such a theory"). The Court emphasized in *Sims* that its holding was "consistent with the general proposition that a defendant is entitled to an instruction on every essential question or point of law supported by evidence." *Id.* As we have explained, Nicholson presented "some evidence" to support all four elements of perfect self-defense. Accordingly, it does not matter that Nicholson's claim of self-defense was inconsistent with his overall defense strategy at trial. We, therefore, hold that the circuit court erred in refusing Nicholson's request for a jury instruction on self-defense.

B.      *The Circuit Court's Refusal to Instruct the Jury on Self-Defense Was Harmless Error.*

The State argues that "any error by the trial court in refusing to give the [self-defense] instruction was harmless." We agree. The Court of Appeals has explained the harmless error test in the following terms:

> [W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of -- whether erroneously admitted or excluded -- may have contributed to the rendition of the guilty verdict.

13

*Dionas v. State*, 436 Md. 97, 108 (2013) (quoting *Dorsey v. State*, 276 Md. 638, 659 (1976)). "What's more, once error is established, the burden falls upon the State, the beneficiary of the error, to exclude this possibility beyond a reasonable doubt." *Id.* (quoting *Hunter v. State*, 397 Md. 580, 596 (2007)). Thus, "[h]armless error review is the standard of review most favorable to the defendant short of an automatic reversal." *Simms v. State*, 194 Md. App. 285, 323 (2010) (quoting *Bellamy v. State*, 403 Md. 308, 333 (2008)), *aff'd*, 420 Md. 705 (2011).

In the case *sub judice*, Nicholson was acquitted of first and second-degree murder. Consequently, the circuit court's error was harmless with respect to these two charges.[1] The only conviction returned by the jury that might have been affected by the presence or absence of a self-defense instruction was second-degree felony murder. "It has been established," however, "that self-defense is not a defense to felony murder." *Sutton v. State*, 139 Md. App. 412, 454 (2001)); *see also State v. Richardson*, 341 N.C. 658, 668 (1995) ("Self-defense, perfect or imperfect, is not a defense to first-degree murder under the felony murder theory, and only perfect self-defense is applicable to the underlying felonies."); *State v. Oates*, 540 S.W.3d 858, 861-62 (Mo. 2018) (holding that self-defense is not a defense to felony murder where the underlying felony does not involve the use of

---

[1] Even if the verdict in Nicholson's case were to be reversed, and his case remanded for a new trial, the State may not prosecute Nicholson a second time for first and second-degree murder. *See Ashe v. State*, 125 Md. App. 537, 544 (1999) (explaining that the Double Jeopardy Clause "protects against a second prosecution for the same offense after acquittal") (quoting *Brown v. Ohio*, 432 U.S. 161, 165 (1977)).

14

force), *reh'g denied* (Apr. 3, 2018);[2] *Woodard v. State*, 296 Ga. 803, 808 (2015) (holding that "a person is not justified in using force if that person . . . is attempting to commit, is committing, or is fleeing after the commission or attempted commission of a felony"). Because the jury was not permitted to acquit Nicholson of second-degree felony murder on the basis of self-defense, the circuit court's refusal to give an instruction on that issue could have no prejudicial effect.

Nicholson argues that our holding in *Sutton* only applies to cases of felony murder where the underlying felony involves force or the threat of force. According to Nicholson, the principle that "self-defense is not a defense to felony murder" is merely a general rule arising from "the fundamental concept that the accused claiming the right of self-defense must not have been the aggressor or provoked the conflict." *Sutton*, *supra*, 139 Md. App. at 454-55. In those cases where the defendant was not in any sense the aggressor, Nicholson reasons that the general rule would not apply, and self-defense would be a permissible defense to the felony murder charge.

Nicholson reads *Sutton* too narrowly. In *Sutton*, the defendant was charged with first-degree assault, felony murder, and robbery with a deadly weapon. *Id.* at 420. The robbery charge served as the underlying felony for the murder charge. *Id.* The trial court instructed the jury that self-defense applied only to first-degree assault and not to felony murder. *Id.* at 453. In holding that the trial court had not erred in propounding the

---

[2] Because Missouri statutory law makes self-defense inapplicable to forcible felonies, *see Oates*, *supra*, 540 S.W.3d at 862 n.5, the Court's ruling in *Oates* effectively bars defendants from claiming self-defense as a defense to felony murder in any circumstances.

instruction, we affirmed categorically that "self-defense is not a defense to felony murder." *Id.* at 454. Had we intended to limit this rule to cases where the underlying felony involves force or the threat of force, we could easily have included language to that effect. Instead, we stated the rule broadly and without qualification. Indeed, we noted that when the Court of Appeals enumerated the elements of self-defense in *State v. Faulkner*, 301 Md. 482 (1984), it referred to them as "the elements required to justify a homicide, *other than felony murder*[.]" *Id.* (emphasis in original). The Court's blanket exclusion of felony murder from its discussion of self-defense undermines Nicholson's assertion that self-defense is applicable to felony murder in some cases.

To be sure, in *Sutton* we went on to discuss a body of case law holding that someone who commits robbery is an aggressor *as a matter of law* and therefore cannot claim self-defense if he kills the target of the robbery. *Sutton*, *supra*, 139 Md. App. at 455-456. We addressed this case law because it spoke directly to the specific circumstances before us: a robber who claimed self-defense after killing the robbed. Accordingly, we discussed *Street v. State*, 26 Md. App. 336 (1975), in which this Court held that "the claim of self-defense was unavailable to appellant as a matter of law because he was an aggressor engaged in the perpetration of a robbery." *Id.* at 455. It was in this context that we invoked "the fundamental concept that the accused claiming the right of self-defense must not have been the aggressor or provoked the conflict." *Sutton*, *supra*, 139 Md. App. at 454-55.

Our discussion of this case law, however, need not be construed as narrowing the general principle that "self-defense is not a defense to felony murder." Indeed, one of the

16

cases we cited was *Smith v. Tennessee*, 209 Tenn. 499, 503 (1961), wherein the Supreme

Court of Tennessee gave its approval to the following proposition:

> [T]he person who kills another *while engaged in committing a felony* cannot escape conviction from murder in the first degree, by showing that his intent was not to kill, but to defend his own life or person . . . .

*Id.* at 455 (emphasis added).  Although in *Sutton* we were especially concerned with felony

murder predicated on robbery, we did not endorse, explicitly or implicitly, the use of self-

defense in cases of felony murder predicated on non-forcible crimes.

Furthermore, Nicholson's argument is contrary to the purpose of Maryland's felony

murder law.  "[S]econd-degree felony murder is an unlawful killing in the course of the

commission of a felony that is inherently dangerous to human life but is not included

among the felonies enumerated in [Crim. Law] § 2-201."  *State v. Jones*, 451 Md. 680, 708

(2017).  As the Court of Appeals has explained, felony murder is defined by the

dangerousness of the underlying conduct, rather than the intent to kill:

> The modern version of the [felony murder] rule is intended to deter dangerous conduct by punishing as murder a homicide resulting from dangerous conduct in the perpetration of a felony, even if the defendant did not intend to kill.  If the felonious conduct, under all of the circumstances, made death a foreseeable consequence, it is reasonable for the law to infer from the commission of the felony under those circumstances the malice that qualifies the homicide as murder.

*Fisher v. State*, 367 Md. 218, 262 (2001).  Whether the underlying felony is inherently

dangerous "is determined by the nature of the crime or by the manner in which it was

perpetrated in a given set of circumstances."  *Id.* at 263.

In convicting Nicholson of second-degree felony murder, the jury necessarily found that Nicholson's felonious conduct was inherently dangerous, and Nicholson does not challenge that finding on appeal. Indeed, the jury could have reasonably inferred from the evidence that Nicholson arrived at the rendezvous armed and prepared to use violence as necessary to protect himself and his product. Furthermore, the dollar value of the marijuana being sold -- $3,200 -- suggested that the stakes were high and potentially dangerous. It was Nicholson's decision to engage in an inherently dangerous felony that resulted in the killing of Johnson; to the extent that Nicholson was confronted with a dangerous situation, he was responsible for creating that situation. We, therefore, decline to depart from the general rule, clearly stated in *Sutton*, that self-defense is not a defense to felony murder.

Although we need not look beyond Maryland case law to resolve this question, we note that Nicholson cites a number of cases from other jurisdictions to support the proposition that self-defense is applicable to felony murder in some circumstances. In our view, none of these cases is on point. In *Perkins v. State*, 576 So.2d 1310 (Fla. 1991), the Supreme Court of Florida, construing a state statute that makes self-defense unavailable to a person committing a forcible felony, held that cocaine trafficking was not a forcible felony. Unlike the Florida legislature, our General Assembly has not acted to limit the self-defense exception to forcible felonies. Consequently, the relevance of *Perkins* to our analysis is minimal at best. The same is true of *State v. Cook*, 86 So.3d 672 (Ct. App. La. 2012), in which the Supreme Court of Louisiana held that a statutory "drug sale exception" to self-defense did not apply to a claim of self-defense based on the defendant's reasonable

18

belief that his life was in danger. In the absence of similar provisions in the Maryland Code, we will not extend the holdings of either *Perkins* or *Cook* to Maryland's second-degree felony murder law.[3]

Nor do we find in *Commonwealth v. Fantauzzi*, 91 Mass. App. Ct. 194 (2017), a compelling grounds for reversing Nicholson's conviction. In *Fantauzzi*, the defendant shot and killed someone who tried to rob him at knifepoint during a drug deal. *Id.* at 324-25. The defendant was charged with second-degree felony murder, with unlawful possession of a firearm serving as the predicate felony. *Id.* at 327. The trial court did not give the jury an instruction on self-defense for the felony murder charge. *Id.* at 329. Under the particular circumstances of the case, the Court held that the defendant was entitled to an instruction on self-defense. *Id.* at 332. Critically, the Court's holding was based on its belief that the underlying felony was not inherently dangerous:

> We conclude that the general rule that self-defense is not applicable to felony-murder does not apply in the circumstances of this case. *Where the felony was not inherently dangerous*, and the defense was based on the assertion that the defendant was not the aggressor and initiator of the violence, an instruction on self-defense in relation to felony-murder should have been given.

---

[3] Nicholson also cites *Davis v. State*, 290 Ga. 757 (Ga. 2012), for the proposition that "under Georgia law the jury determines whether the statutory exception to the use of self-defense applies." Nicholson's understanding of Georgia's felony murder law is outdated. In *Davis*, the Supreme Court of Georgia was applying its earlier ruling in *Heard v. State* that "where there is sufficient evidence of a confrontation between the defendant and the victim, or other circumstances which ordinarily would support a charge on justification, the defendant is not precluded from raising justification as a defense." *Supra*, 290 Ga. at 758-59. In *Woodard v. State*, 296 Ga. 803 (2015), the Supreme Court of Georgia, overruling *Heard*, held that self-defense is never a defense to felony murder.

19

*Id.* at 332 (emphasis added). In the present case, Nicholson's conviction for felony murder was, by definition, based on a finding that the underlying felony was inherently dangerous, and Nicholson does not challenge that finding on appeal. Consequently, even if we were to adopt the reasoning of *Fantauzzi* -- which we decline to do -- we would still hold that the circuit court's error in the present case was harmless.

In sum, the record demonstrates that Nicholson produced sufficient evidence to generate the issue of self-defense. It does not matter that Nicholson denied being the shooter or that the forensic evidence undermined Nicholson's statement to the police. Nicholson was entitled to the jury instruction, and the circuit court erred in refusing to propound it. Nevertheless, the error did not prejudice Nicholson because he was acquitted of all homicide charges except for felony murder, which cannot be justified by self-defense. Accordingly, we hold that, under these circumstances, the circuit court's error was harmless beyond a reasonable doubt.

## II. The Evidence Was Sufficient to Sustain Nicholson's Conviction for Possession with Intent to Distribute.

Nicholson argues that "[b]ecause the State failed to present independent evidence corroborating the offense of possession of marijuana with intent to distribute it, the conviction must be reversed." Nicholson notes that a reversal of the conviction for the predicate felony would also necessitate a reversal of the felony murder conviction. The State argues that Nicholson's statement to the police was substantially corroborated by eyewitness testimony and circumstantial evidence. We agree with the State.

20

As a preliminary matter, we must determine whether Nicholson properly raised this issue at the trial level. At the close of evidence, a defendant may move for a judgment of acquittal. Md. Rule 4-324(a). The defendant must "state with particularity all reasons why the motion should be granted." Md. Rule 4-324(a). Maryland courts have repeatedly held that where a particular ground for a motion for judgment of acquittal is not raised at trial, any appellate review on those grounds is waived. *See, e.g., Starr v. State*, 405 Md. 293, 302 (2008); *State v. Lyles*, 308 Md. 129, 135-36 (1986); *Johnson v. State*, 90 Md. App. 638, 649 (1992); *Simpkins v. State*, 79 Md. App. 687, 696 (1989).

In his motion for judgment of acquittal, Nicholson's counsel did not explicitly argue that Nicholson's confession was insufficient to sustain the conviction. The relevant exchange in the transcript is as follows:

> [DEFENSE COUNSEL]: -- just one more issue.
>
> As to the marijuana, even though my client indicated that it was a marijuana sale I don't believe there's any marijuana recovered or any corpus as to any marijuana.
>
> THE COURT: Well we have an extensive discussion by your client about --
>
> [DEFENSE COUNSEL]: Yes.
>
> THE COURT: -- his marijuana.
>
> [DEFENSE COUNSEL]: Abso, absolutely.
>
> THE COURT: And the proceeds of some drug sales in his pocket.
>
> [DEFENSE COUNSEL]: Not that day. I mean he didn't have proceeds.

21

THE COURT:  Well I don't know, but January 10th I don't know what that money was from.

[DEFENSE COUNSEL]:  Oh, --

THE COURT:  Just that he had a lot of money in his pocket; right?

For whatever reason Detective Bollinger --

[DEFENSE COUNSEL]:  $300.00

THE COURT:   -- gives it back to him.

[DEFENSE COUNSEL]:  Correct.

THE COURT:  Or to --

[DEFENSE COUNSEL]:  Ms. Lewis

THE COURT:  -- someone connected with him.

[DEFENSE COUNSEL]:  Yes.

THE COURT:  All right, the motion is denied at this time.

Although Nicholson's counsel challenged the evidentiary basis of the conviction in a general sense, he did not state the particular legal grounds that he now raises on appeal, namely, that a criminal conviction cannot rest solely on an uncorroborated confession. Accordingly, it is not clear to us that Nicholson preserved this issue for appeal.

Assuming *arguendo* that the issue was preserved, it is without merit.  This Court recently discussed the standard of review for sufficiency of the evidence to support a conviction:

> When reviewing the sufficiency of the evidence to support a conviction, we determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier

22

of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Smith*, 374 Md. 527, 533, 823 A.2d 664 (2003) (emphasis added). Our role is not to retry the case: "[b]ecause the fact-finder possesses the unique opportunity to view the evidence and to observe first-hand the demeanor and to assess the credibility of witnesses during their live testimony, we do not re-weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence." *Smith v. State*, 415 Md. 174, 185, 999 A.2d 986 (2010) (citations omitted).

*Cagle v. State*, 235 Md. App. 593, 603-04, *cert. granted*, 459 Md. 169 (2018).

Here, Nicholson challenges a conviction for possession of marijuana with intent to distribute. To possess something is "to exercise actual or constructive dominion or control" over it. Crim. Law § 5-101(v). Possession of contraband need not be exclusive or actual to sustain a conviction. *Cable v. State*, 65 Md. App. 493, 495 (1985). Nevertheless, the evidence "must show directly or support a rational inference that the accused did in fact exercise some dominion or control over the [contraband]." *Taylor v. State*, 346 Md. 452, 460 (1997). In determining whether a person possesses contraband constructively or jointly, Maryland courts consider the following factors:

> 1) proximity between the defendant and the contraband, 2) the fact that the contraband was within the view or otherwise within the knowledge of the defendant, 3) ownership or some possessory right in the premises or the automobile in which the contraband is found, or 4) the presence of circumstances from which a reasonable inference could be drawn that the defendant was participating with others in the mutual use and enjoyment of the contraband.

*Belote v. State*, 199 Md. App. 46, 55 (2011) (quoting *Folk v. State*, 11 Md. App. 508, 518 (1971)). In *Belote*, this Court added two more factors to consider: (1) "the nature of the

premises where an arrest is made or search is executed," and (2) "circumstances indicat[ing] a common criminal enterprise." *Id.* at 56.

In the case *sub judice*, Nicholson told police that he arranged for Stewart to bring a pound of marijuana to Lower Gate Court to sell to "Man," and that Nicholson would get a "cut" of the proceeds. The trial court instructed the jury that they could find Nicholson guilty of possession with intent to distribute marijuana "as an accomplice even though the Defendant did not personally commit the acts that constitute that crime." *See Grandison v. State*, 305 Md. 685, 703 (1986) (noting that "one who encourages, aids, abets, or assists the active perpetrator in the commission of the offense, is a guilty participant, and in the eye of the law is equally culpable with the one who does the act"); *see also Sheppard v. State*, 312 Md. 118, 122 (1988) ("In order to establish complicity for the principal offense, the State must prove that the accused participated in the offense either as a principal in the second-degree (aider and abettor) or as an accessory before the fact (inciter)."), *abrogated in part by State v. Hawkins*, 326 Md. 270 (1992). Thus, we will consider the conduct of both Nicholson and Stewart in evaluating the evidence supporting Nicholson's conviction.

Nicholson's confession, standing on its own, provides fairly strong evidence that Stewart was in possession of a pound of marijuana and intended to sell it to Carpentieri with the assistance of Nicholson as an accomplice. In his statement to the police, Nicholson admitted that he "sell[s] weed." Nicholson recounted that he received a text message from someone named "Man" who "wanted to buy a pound" of marijuana. Nicholson told the police that he did not have that amount of marijuana, so he contacted Stewart, who agreed to provide the product and give Nicholson "a cut." Nicholson told the police that he met

24

Stewart at Lower Gate Court with the purpose of selling the marijuana to "Man." Nicholson admitted that Stewart and the potential buyers got into his vehicle, and that Stewart brought the marijuana with her. A jury could also infer from Nicholson's narrative that he had joint or constructive possession of the marijuana brought by Stewart into Nicholson's vehicle, inasmuch as Nicholson was near it, knew about it, owned the vehicle it was in, and participated in selling it. Indeed, Nicholson told the police that the assailants "took my weed," indicating that Nicholson exercised some dominion or control over the contraband.

As Nicholson correctly points out, the State could not rely solely on his extrajudicial confession to prove the possession charge. "Maryland follows the general rule that, as a matter of substantive law, a criminal conviction cannot rest solely on an uncorroborated confession." *Miller v. State*, 380 Md. 1, 46 (2004). Thus, an extrajudicial confession "must be supported by evidence, independent of the confession, which relates to and tends to establish the *corpus delicti, i.e.,* the facts that are necessary to show that a crime has been committed." *Cox v. State*, 421 Md. 630, 657 (2011) (internal citations omitted). The corroborating evidence "need not be full and positive proof of the *corpus delicti* and may be small in amount, if such proof, when considered with the confession, convinces the jury beyond a reasonable doubt of the guilt of the accused." *Ballard v. State*, 333 Md. 567, 575 (1994) (internal citations omitted).

Critically, Nicholson's confession was corroborated on every important point. Nicholson's statement that Stewart had access to a pound of a marijuana was corroborated by text messages between Stewart and Reeves indicating that Stewart had given Reeves

25

approximately half a pound of marijuana, and that Stewart had kept the other half. Nicholson's statement that Stewart met him at Lower Gate Court and got into his vehicle was corroborated by the testimony of Wambui, Vega, and Piechowski. Wambui testified that he saw someone exit V2 and enter V1 prior to the shooting. Vega's testimony indicated that the person who exited Nicholson's vehicle and drove away was a woman. Piechowski took a photograph of the license plate of the vehicle that the woman was driving. The police confirmed that the vehicle was a Kia Sportage that was accessible to Reeves.

Nicholson's statement that he had arranged the rendezvous for the purpose of selling marijuana was corroborated by the items found in Nicholson's home: two scales with marijuana residue on them, two bags containing marijuana, and a box of sandwich bags on top of the dresser in the master bedroom. The version of events in Nicholson's statement was further corroborated by the text messages introduced into evidence by the State. Carpentieri wrote to Nicholson at 8:25 p.m., "43 Lower Gate Court, Owings Mills." In another message, Carpentieri wrote, "you got it?" Nicholson responded, "Yeah." At 10:32 p.m., Nicholson wrote to Carpentieri, "Rdy. Pull up." Carpentieri responded, "Rd, I'm coming now."

More broadly, a jury could infer from the circumstantial evidence that Nicholson, Stewart, and Carpentieri met at Lower Gate Court on January 7, 2016 for the purpose of conducting a drug sale. Notably, the rendezvous took place in a parking lot at night, with people from three differing vehicles entering a single vehicle. Two of the participants had access to marijuana. Among the participants was an apparent marijuana dealer and

26

someone with access to a pound of marijuana.  At least three of the participants were armed, and the meeting ended in a violent shootout.  Indeed, the most plausible explanation for the events that occurred that night is a drug deal gone awry.

As the foregoing makes clear, the State did not rely solely on Nicholson's extrajudicial confession to prove the possession charge.  Instead, the State presented evidence corroborating Nicholson's admission that Stewart was in possession of one pound of marijuana, which she brought to Lower Gate Court with the intention of selling, and that Nicholson was an accomplice to this crime.  A jury could also infer from this evidence that Nicholson, as a marijuana dealer himself, was a co-seller of the marijuana, who had joint or constructive possession over the contraband that Stewart brought into his vehicle and intended to sell it for a share of the profits.  Nicholson's confession and the evidence corroborating that confession were more than sufficient to sustain a conviction for possession of marijuana with intent to distribute.

## III.  The Circuit Court Properly Submitted the Charge of Second-Degree Felony Murder to the Jury.

Nicholson claims that "[t]he trial court erred in submitting to the jury a charge of second-degree felony murder, which was not contained in the indictment and was not a lesser included offense of any charge contained in the indictment."  We disagree.

Crim. Law § 2-208 provides the statutory short-form indictment for murder and manslaughter:

> (a) An indictment for murder or manslaughter is sufficient if it substantially states:

27

"(name of defendant) on (date) in (county) feloniously (willfully and with deliberately premeditated malice) killed (and murdered) (name of victim) against the peace, government, and dignity of the State."

The State's criminal indictment against Nicholson clearly satisfies the requirements of Crim. Law § 2-208:

CARLOS LEVELL NICHOLSON, on or about 1/7/2016, in Baltimore County, did feloniously, willfully and with deliberately premeditated malice kill and murder one Treshawn Johnson; against the peace, government, and dignity of the State. (First Degree Murder, Criminal Law Article 2-201 and 2-208, 1 0990)[.]

Notably, the Court of Appeals has held that the statutory short-form indictment is sufficient to charge first-degree premeditated murder, second-degree murder, manslaughter, and felony murder. *Dishman v. State*, 352 Md. 279, 287-89 (1998); *McMillan v. State*, 181 Md. App. 298 (2008), *rev'd on other grounds*, 428 Md. 333 (2012). Indeed, in *Dishman v. State* the Court noted that the short-form indictment "charges *each of the homicide offenses*, even if it is couched in terms of first degree murder." *Supra*, 352 Md. at 303 (emphasis added).

Nicholson concedes that the short-form indictment used by the State is sufficient to charge most kinds of murder. He denies, however, that the short-form indictment is sufficient to charge second-degree felony murder. Nicholson appears to believe that the only reason the short-form indictment can be used to charge second-degree murder and manslaughter is that these charges are lesser included offenses of first-degree premeditated murder. Nicholson argues that second-degree felony murder must be charged explicitly

28

and separately because it is not a lesser included offense of first-degree felony murder or any other form of murder charged by the short-form indictment.

The basic assumption behind Nicholson's argument is incorrect. In *Dishman*, the Court of Appeals made it clear that its holding was not based on a "lesser included offense" analysis:

> While some of these [prior] cases refer to second degree murder and manslaughter as lesser offenses of first degree murder, the language makes clear that an indictment under § 616[4] alleging first degree murder also *charges* second degree murder and manslaughter.

*Supra*, 352 Md. at 289-90 (emphasis in original). Thus, whether or not second-degree felony murder is a lesser included offense of first-degree felony murder is beside the point. *See McMillan*, *supra*, 181 Md. App. at 351 ("[T]he cases cited by appellant concern the question of whether one offense is the same as another for purposes of double jeopardy; they do not speak to the jurisdictional sufficiency of an indictment.").

By its plain language, Crim. Law § 2-208 applies to *any* "murder or manslaughter" charge, and Maryland appellate courts have consistently rejected attempts to narrow the range of homicide charges supported by the short-form indictment. *See McMillan*, *supra*, 181 Md. App. at 351 (holding that "appellant's indictment, which conformed in every relevant way with the statutory form specified in [Crim. Law] § 2-208, invested the circuit court with jurisdiction to try him for *murder of any variety* -- including felony-murder"

---

[4] Crim. Law § 616 was the predecessor to Crim. Law § 2-208. The newer version of the short-form indictment is substantially the same as the old version, and it is subject to the same case law. *See, e.g., Smith v. State*, 196 Md. App. 494, 533 (2010) (applying *Dishman* in construing Crim. Law § 2-208), *rev'd on other grounds*, 423 Md. 573 (2011).

29

(emphasis added)); *see also Ross v. State*, 308 Md. 337, 339 (1987) (holding that "the short form indictment specified by [Crim. Law] § 616 to charge *all forms of murder* adequately protects a defendant's constitutional right of fair notice and due process" (emphasis added)).  We, therefore, hold that the State's criminal indictment against Nicholson was sufficient to charge him with second-degree felony murder.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**