Judgment rendered August 27, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,382-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                    Appellee

versus

JOSHUA JAMES PARKS                    Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 380,303

Honorable Christopher T. Victory, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Edward K. Bauman

JOSHUA JAMES PARKS                   Pro Se

JAMES E. STEWART, SR.                Counsel for Appellee
District Attorney

KODIE K. SMITH
WILLIAM J. EDWARDS
MARGARET E. RICHIE GASKINS
Assistant District Attorneys

* * * * *

Before PITMAN, STONE, and THOMPSON, JJ.

**PITMAN, C. J.**

Defendant Joshua Parks appeals his conviction for second degree murder, a violation of La. R.S. 14:30.1, for which he was sentenced to life in prison without parole, probation or suspension of sentence. For the following reasons, his conviction and sentence are affirmed.

**FACTS**

Defendant was indicted for the second degree murder of Edward Lattin, a violation of La. R.S. 14:30.1. The murder occurred on December 18, 2020, in Caddo Parish. At the trial of the matter in August 2024, the following evidence was adduced. Shreveport Police Department ("SPD") Corporal John Scheen testified that on December 18, 2020, at 9 a.m., he responded to a call about a shooting at 2826 DeSoto in Shreveport. When he arrived, he saw an unconscious black male, later identified as Lattin, lying face down in the street with multiple bullet wounds in his back. Two distraught women were sitting beside him. Lattin was transferred by ambulance to Oschner LSU Health Shreveport where he was declared deceased. Cpl. Scheen testified that the victim did not have a shirt on and that he was able to see the bullet wounds in his back.[1]

SPD Officer Monica Davis testified that she was dispatched to the scene and saw a black male wearing a white shirt who had multiple gunshot wounds to his upper torso. She was informed that the person who shot the victim was nicknamed Coco, later identified as Defendant, who lived at

---

[1] Although how the victim was clothed after the shooting seems to be irrelevant, Defendant raises discrepancies in the testimony of various witnesses in his argument concerning sufficiency of the evidence.

2816 DeSoto. She cleared the residence, but he was not there. He was described to her as a tall black male wearing all gray.

SPD Officer Michael Milczarski testified that after securing the scene at Lattin's home, he took part in a search of the path he believed the suspect had traveled on the north side of the street. He did not find the suspect or a gun. He also took part in a search of the victim's house, found no weapons but noted that a pair of jeans were found in a bedroom.

Zykira Ashley, best friend of Lattin's girlfriend Laterrorica Griffin, was at Griffin's & Lattins' house on the morning of the shooting. Griffin's mother, Teresa Johnson, was also there. Ashley testified that while Griffin was cooking breakfast, Lattin left the home to go to Defendant's house nearby to get a phone charger. He came back angry and was "hollering." She said that he went back outside because he wanted to fight with Defendant. A few minutes later, at Griffin's request, Ashley went outside because she heard Lattin screaming at Defendant. Ashley testified that initially only Lattin and Defendant were outside but that Defendant's girlfriend, Deaquanesha French, joined them.

Ashley stated that when she went outside, Lattin and Defendant were far apart. Lattin was in the street and Defendant was standing on his porch. Lattin was not armed. Griffin came out a few minutes later and stood in the street by Ashley. Ashley testified that French approached Lattin, who asked her if she wanted to fight, and that is when "everything took place." Shots began being fired. She did not see Defendant shooting because it happened so quickly, but she turned and ran as soon as the shooting began. When she turned back around, she saw Lattin on the ground and Defendant approach him and continue shooting. She testified that she was in shock, that French

2

left the scene and that she and Griffin went to Lattin's side to check on him. The victim was still conscious at that point and was speaking. Griffin removed his pants, but Ashley did not know why. She testified that there were no weapons or guns around his body. She did not know who called 911, but the police and fire department arrived, and she was taken to the detective's office to make a statement. She was shown Defendant's picture, and she identified him at that time and in court. She testified that prior to the shooting, Defendant did not argue or issue any warning of his intentions.

On cross-examination, Ashley stated that she had never met Lattin before that day. She described him as being upset when he came back to the house and stated she thought the reason was because he did not get the phone charger, but she was not sure why he was upset.

Griffin testified that she had known Defendant for a very long time and that he lived with French on DeSoto Street. She, her mother, Lattin and Ashley were at the house that morning when Lattin left to go get a charger from Defendant. When he returned, he was "just going off" because French was upset with him for coming over to her house so early and waking up her children. He left the house again, but she stayed inside because she was cooking breakfast. By the time Griffin went outside, Lattin was standing about four steps from their driveway, but French was crossing the street in front of her house. Griffin stated that she and Ashley joined Lattin in the street. She testified that Lattin removed his white shirt while he and French were arguing. Defendant followed French out of their house and began arguing too. Lattin put his hands up like he was about to fight, and Defendant, who was standing behind French, without warning, started firing a gun instead of fighting. She stated that they all froze "because what you

3

got a gun for?" Defendant continued to shoot Lattin three or four times before he fell facedown to the ground and said, "I'm down," but Defendant kept shooting. She stated that Defendant handed something to French, ran into the house and disappeared.

Griffin testified that Lattin was still able to speak when she went to him, and he told her to get a bag of powder out of his pants. She retrieved her house keys from his pants but did not find any bags of powder, so she took his pants off and put them in the dirty clothes basket in her house. She did not see any guns or weapons and had testified earlier that she did not allow guns in her house because they scared her. She stated that a man in a red car witnessed the incident from the corner where he had stopped and that he was the person who called the police.

On cross-examination, Griffin reiterated that Lattin never had a gun. She testified that Lattin and Defendant had known each other for a long time. She stated that the two of them had gotten into a physical altercation a few weeks before the shooting because French had stolen Griffin's air conditioning unit out of her house and tried to "jump her."

Steven Roberts, the driver of the red car, testified that he witnessed the shooting as he was driving down DeSoto Street that morning. He saw two men standing about 20 feet apart getting ready to fight. The victim was shirtless and wore blue jeans; the other person was wearing gray. He could hear the two men arguing about a phone charger. Roberts stayed in his car and watched. He stated that the victim had his hands up and did not have a weapon because he was "bar fighting," which he defined as a fight when a person has his "hands up and you're just talking, cussing." He saw Defendant come around a car and, without warning, start shooting. He

4

testified that the victim tried to get away as soon as the shooting began.  The victim spun around and took one shot to the back and then realized he had been hit.  Roberts said he got out of his car but was ducking because he did not know where the bullets were coming from, and then Defendant shot two more times.  He testified that Defendant walked up to Lattin, stood over him and shot him while he was facedown on the ground.  Roberts stated that Defendant fired four more times and that one of the shots as he stood over him was to Lattin's head.  At that point, Defendant ran away.  He called 911 and waited at the scene until the ambulance arrived.  He approached Lattin who asked him to tell his children that he loved them.   Roberts testified that he did not see any weapons near Lattin's body and that he did not see anyone remove anything from around the body.  He also stated that Lattin's pants were on while he was speaking to him because he could see that the waistband was loose, and there were no weapons hidden there.  Roberts stated that he did not know any of the people involved in this incident.

Dr. Long Jin, forensic pathologist, performed the autopsy on the victim's body, and his report was published to the jury.  He stated that Lattin had been shot a total of eight times. The bullets were designated A through H, and only one of them, the one that grazed but did not penetrate, was shot from the front.  Gunshot wound A entered the back of the head on the right side and exited through the right cheek.  He testified that out of all the gunshot wounds to Lattin's body, the wound caused by bullet C was the fatal wound.  It entered through his left back and perforated his heart and right lung and lodged there.  Dr. Jin was asked about the toxicology report, and he indicated that Lattin had some cocaine in his system at the time of his death.

Summer Johnson, a former employee of the North Louisiana Crime Lab and an expert in firearms identification, testified regarding seven fired .380 caliber cartridge casings and about bullets and fragments recovered from the victim's body, which had been delivered from the Caddo Parish Coroner's office. She testified that seven of the cartridge cases were fired with one .380 caliber weapon, but the fragments were too damaged to be identifiable.

Detective Stephen Herring was the lead investigator of this homicide. After obtaining a search warrant, he conducted a search of Griffin's house and canvassed the entire area for any evidence. In the search of the house, he found nothing to indicate the victim owned a firearm–no holsters, shell casings or ammunition. He testified that Defendant turned himself in to the police the day of the murder and that he had what appeared to be dried blood on his tennis shoes. The blood was later determined to be that of the victim.

On August 21, 2024, a unanimous jury returned a verdict of guilty as charged of second degree murder. Sentencing took place on September 4, 2024, and Defendant was sentenced to life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence in accordance with La. R.S. 14:30.1.

Defendant appeals his conviction but not his sentence.

## DISCUSSION

Defendant argues that the evidence, when viewed in the light most favorable to the prosecution, was insufficient to show he did not act in self-defense when he shot Lattin, or alternatively, that a verdict of manslaughter was more appropriate. He contends that the state has the burden of proof beyond a reasonable doubt that the homicide was not perpetrated in self-

defense. He asserts that the state failed to show even minimally sufficient evidence that he was not acting in self-defense. Defendant reiterated evidence at trial and challenged the witnesses' powers of observation because of conflicting testimony regarding how the victim was clothed, i.e., whether he was shirtless, or had on a white shirt, and whether he had on pants where a weapon could have been concealed. In the alternative, Defendant contends manslaughter would have been a more appropriate verdict.

The state argues that the evidence presented was clearly sufficient for the jury to have reached a verdict of second degree murder because Defendant had the specific intent to kill Lattin. Nothing in the evidence suggests Defendant acted in self-defense, in defense of his girlfriend or in a sudden passion. Based on the evidence, a rational juror could have found beyond a reasonable doubt that Defendant committed the second degree murder of Lattin.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004). This standard, now codified in La. C. Cr. P. art. 821, does not afford the appellate court with a means to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Johnson*, 55,254 (La. App. 2 Cir. 8/9/23), 370 So. 3d 91.

Appellate courts neither assess the credibility of witnesses nor reweigh evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. Rather, the reviewing court affords great deference to the jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Gilliam*, 36,118 (La. App. 2 Cir. 8/30/02), 827 So. 2d 508, *writ denied*, 02-3090 (La. 11/14/03), 858 So. 2d 422. Where there is conflicting testimony concerning factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Allen*, 36,180 (La. App. 2 Cir. 9/18/02), 828 So. 2d 622, *writ denied*, 02-2595 (La. 3/28/03), 849 So. 2d 566, *writ denied*, 02-2997 (La. 6/27/03), 847 So. 2d 1255, *cert denied*, 540 U.S. 1185, 124 S. Ct. 1404, 158 L. Ed 2d 90 (2004).

When a defendant challenges the sufficiency of the evidence in a self-defense case involving a homicide, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. *State v. Jackson*, 55,312 (La. App. 2 Cir. 11/15/23), 374 So. 3d 354. A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger or when committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. La. R.S. 14:20 (A)(1) and (2). The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to

his own life or person if he attempted to prevent the felony without the killing.  La. R.S. 14:20(A)(2).  A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.  La. R.S. 14:21.

Manslaughter is defined as a homicide which would be murder under either La. R.S. 14:30 (first degree murder) or La. R.S. 14:30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.  La. R.S. 14:31(A)(1).  Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood had actually cooled, at the time the offense was committed.  *Id.*  Manslaughter is also a homicide committed without any intent to cause death or great bodily harm.  La. R.S. 14:31(A)(2).

For murder to be reduced to manslaughter, the following must be proved: (1) the homicide was committed in sudden passion or heat of blood; (2) that sudden passion or heat of blood was immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection; (3) the defendant's blood did not cool between the provocation and the killing; and (4) an average person's blood would not have cooled between the provocation and the killing.  *State v. Johnson*, *supra.*

In any criminal proceeding in which the justification of self-defense is raised pursuant to La. R. S. 14:19 or 20, the state shall have the burden to

prove beyond a reasonable doubt that the defendant did not act in self-defense.  La. C. Cr. P. art. 390(A).

When the defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense.  *State v. Matthews*, 464 So. 2d 298 (La. 1985); *State v. Cook*, 46,843 (La. App. 2 Cir. 1/25/12), 86 So. 3d 672, *writ denied*, 12-0640 (La. 6/22/12), 91 So. 3d 969.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm.  La. R.S. 14:30.1(A).  Specific criminal intent is that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.  La. R.S. 14:10. Specific intent need not be proven as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. *State v. Graham*, 420 So. 2d 1126 (La. 1982).  Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. *State v. Seals*, 95-0305 (La. 11/25/96), 684 So. 2d 368.  It may also be inferred from the extent and severity of the victim's injuries and the defendant's use of a deadly weapon to produce those injuries.  *State v. Jackson*, *supra*.

We find that there was sufficient evidence to support Defendant's conviction for second degree murder. The issue of self-defense was never raised during the trial; and, realistically, it could not have been raised under the facts of this case.  Every single witness to the shooting and the

investigation afterwards testified that the victim was unarmed, was expecting a fist fight, was shot at least seven times in the back as he was attempting to retreat from a verbal altercation and was shot as he was already facedown, all of which was over an unneighborly act of attempting to borrow a phone charger before 9 a.m. The state clearly proved that this was not self-defense, that there was no provocation at all for such an act of violence and that it was entirely reasonable for the jury to conclude beyond a reasonable doubt that Defendant committed second degree murder. For these reasons, the assignment of error is without merit.

## CONCLUSION

For the foregoing reasons, the conviction and sentence of Defendant Joshua James Parks are affirmed.

**AFFIRMED.**